UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

THAI-LAO LIGNITE (THAILAND) CO., LTD.,
and HONGSA LIGNITE (LAO PDR) CO., LTD.,

                              Petitioners,

        v.

GOVERNMENT OF THE LAO PEOPLE'S
DEMOCRATIC REPUBLIC,

                         Respondent.

Case No. 10-Civ-5256(KMW)
"ECF CASE"

**ORAL ARGUMENT REQUESTED**

---

**REPLY MEMORANDUM OF LAW OF RESPONDENT TO PETITIONERS'
MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

Anthony J. Hatab, Esq.
DRESSEL & HATAB, P.C.
6 East 45th Street
Suite 1605
New York, New York 10017
Tel.: (212) 980-0202
Fax: (212) 980-4297
E-Mail: hatablaw@verizon.net

*Attorneys for Respondent-Movant
Government of the Lao People's
Democratic Republic*

## Table of Contents

BACKGROUND…………………….....................…...........................   1

ARGUMENT:

I.      FORUM NON CONVENIENS……………………………….............   1

II.     THE JURISDICTIONAL DEFICIENCIES THAT
        MAKE THE AWARD UNENFORCEABLE………………………   3

CONCLUSION…………………….........................................................   12

## Table of Cases

Page

*Baker & Taylor v. Alphacraze.com Corp.*, 602 F.3d 486 (2d Cir. 2010)...at footnote 7    8

*China MinMetals Materials Import & Export Co. Ltd. v. Chi Mei Corp.*,
    334 F.3d 274 (3d Cir. 2003)...at footnote 3    4

*Comer v. Micor Inc.*, 436 F.3d 1098 (9th Cir. 2006)    8

*Contec Corp. v. Remote Solution Co. Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005)    5

*Dallah Estates v. The Ministry of Religious Affairs, Government of Pakistan*,
    [2009] EWCA Civ. 755; [2009] WLR (D) 250    5

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 918 (1995)    5

*Ross v. American Express Co.*, 547 F.3d 137 (2d Cir. 2008)...at footnote 7    8

*Sarhank Group v. Oracle Corporation*, 404 F.3d 657, 659 (2d Cir. 2005)    4, 5, 6

*Sokol Holdings Inc. v. BMB Munai, Inc.*, 207 U.S. Dist. Lexis 43817 (S.D.N.Y. 2007)    2, 8

*Telenor Mobile Communications AS v. Storm LLC*, 584 F.3d 396 (2d Cir. 2009)
    ...and at footnote 4    5, 6

*Telenor Mobile Communications AS v. Storm LLC*, 524 F. Supp. 2d 332, 352
    (S.D.N.Y. 2007)    6

## List of Additional Exhibits

Exhibit T:    Letter of July 18, 2006 written by Mr. Jesadapon Watsa to Banpu International Company.

Exhibit U:    Second Affidavit (first at Ex. O) of Mr. Chumpol Sonchai, dated October 27, 2010.

Exhibit V:    Petitioners' Notice of Deposition to the Respondent Pursuant to Fed. R. Civ. P. 26 and 30(b)(6).

Exhibit W:    Petitioners' First Request for Production of Documents from Respondent.

Exhibit X:    Petitioners' First Set of Interrogatories to Respondent.

Exhibit Y:    Excerpts of Witness Statement of Mr. Wirach Nimmanwathana, dated 17 December 2008, Paragraphs 9 and 12 (this Statement also at Exhibit R).

Exhibit Z:    Excerpts of Witness Statement of Mr. Siva Nganthavee, dated December 17, 2008, Paragraph 39 (this Statement also at Exhibit E).

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THAI-LAO LIGNITE (THAILAND) CO., LTD., AND HONGSA LIGNITE (LAO PDR) CO., LTD., <br><br> Petitioners, <br><br> -against- <br><br> GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC <br><br> Respondent. | **ORAL ARGUMENT REQUESTED** <br><br> REPLY MEMORANDUM OF RESPONDENT TO PETITIONERS' MEMORANDUM OF LAW IN OPPOSITION TO <u>MOTION TO DISMISS</u> <br><br> Case No. 1:10-CV-5256 (KMW) "ECF CASE" <br> Kimba M. Wood <br> United States District Judge |

## <u>REPLY MEMORANDUM OF RESPONDENT TO PETITIONERS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS</u>

1.    Petitioners filed a Memorandum of Law in Opposition to Respondent's Motion to Dismiss the Petition to Enforce a Foreign Arbitral Award which makes two primary points, both of which make clear Respondent's Motion must be granted.

2.    In response to Respondent's Motion to Dismiss on grounds of *forum non conveniens*, Petitioners submit their own lawyer's affidavit to tell this Court that Thai lawyers and Thai citizens think Thai courts are so congested and expensive, they prefer the well-run New York Courts; so does all the world.

3.    In response to Respondent's Motion to Dismiss on grounds that Laos did not (a) consent to arbitrate disputes under the Mining Contracts in Kuala Lumpur with HLL and TLL under the arbitration clause in the Project Development Agreement ("the PDA"), or (b) consent to arbitrate under the PDA, which was the sole basis of the arbitrators' jurisdiction, with non-signatories HLL, TLP and SEAP, Petitioners argue that this Court cannot review the jurisdictional decisions of the arbitrators because of the role of 'competence-competence'. That is wrong as a matter of Second Circuit law and leaves the Petitioners with no defense to the Motion to Dismiss because, paying only deference to the arbitrators' award, they offer no argument to support it and the arbitrators offered no analysis, facts or cases to support their assertion of jurisdiction over non-signatories for the Court to analyse.

## I. Forum non conveniens

4.    Petitioners submit the Affidavit of one Mr. Jesadapon Watsa to tell the Court that Thai proceedings do not offer a true "alternative forum" because the Thai courts are so crowded

and expensive, Thai people and companies would prefer to litigate in the better funded and better managed courts of New York. What Petitioners neglected to do was properly to introduce Mr. Watsa. Mr. Watsa is Mr. Siva Nganthavee's lawyer. Mr. Siva is the principal owner of Petitioner, TLL. Mr. Watsa has been advising Mr. Siva on this case. Indeed he wrote the crucial letter that started the arbitration. On July 18, 2006, Mr. Watsa wrote the letter for Mr. Siva and his companies to Banpu Int'l Company, Mr. Siva's then partner to develop the power plant, terminating Banpu. That letter started the chain that led to the Award and to this proceeding. The letter was an exhibit in the arbitration and is attached hereto as Exhibit T. Mr. Watsa is not an independent expert on any matter before the Court and his affidavit should be disregarded for that reason.

5.      Respondents have asked Mr. Sonchai to respond.[1] He makes clear that Mr. Watsa has, as an advocate for Mr. Siva, grossly overstated the costs and time constraints involved in Thai court proceedings.[2] Mr. Sonchai is not a lawyer for Laos.

6.      There are two additional points to make. First, this Court held in *Sokol Holdings Inc. v BMB Munai, Inc.*, 2007 U.S. Dist. Lexis 43817 (S.D.N.Y. 2007), that when the petitioners are U.S. citizens, they are entitled to a presumption in favor of their choice of forum. These are not U.S citizens; they are entitled to no such presumption. There the Court said New York had a strong interest in monitoring business transactions taking place in New York, as the parties had met and transacted the Kazak deal in New York City. Petitioners say "New York played a central role in the arbitration". Actually, Mr. Siva's New York lawyer negotiated with Laos for him in Laos in 1993/1994 and inserted a New York choice of law provision in the PDA (they did not change the Mining Contracts' choice of Lao law). The parties chose to arbitrate in Malaysia, and they did so. The Award was "made in Malaysia" and the full evidentiary hearings were conducted there. Award, para. 52. Two procedural conferences were held in New York City. Award, paras. 42 and 47. It remains a Malaysian award between Asian parties for two concessions granted to a Thai company in Laos.

7.      Finally in *Sokol Holdings, supra*, there was, the Court said, no evidence of forum shopping. Since Petitioners have picked three forums, all outside Asia, where Paul Hastings

---

[1] Mr. Sonchai's second affidavit, Exhibit U.

[2] Petitioners say in footnote 5 that they are offended that Laos mentioned the high cost of proceeding in New York and London, because Laos has "no information pertaining to Petitioners' legal expenses." It is none of Laos' concern how much or how little Petitioner pays Paul Hastings for the proceedings it has commenced in New York, Paris (yes a third country) and London. Laos must retain and pay counsel qualified in each jurisdiction, and our point was and is, for a poor country, simultaneous multiple proceedings are oppressively expensive.

has offices, to file simultaneous enforcement proceedings, it might be difficult to say which forum they are shopping for. But then Petitioners filed U.S discovery demands upon Laos' counsel and the forum shopping piece became clear.

8.       Petitioners said in their Opposition to Laos' motion to dismiss, in footnote 7, that they have filed "discovery designed, in part, to determine whether and to what extent Laos and/or its corporate agents and alter egos have assets in the United States." That is not quite what they have asked for. In a deposition notice, Petitioners have demanded that The Government of Laos produce in New York on 6 December 2010 a person for a deposition who knows everything about all of the Government's business all over the world. This Lao official must know about: "Any assets in which Laos has any interest, whether present or future or contingent" (Topic 2.) The Lao representative must as well be versed in all: "Receivables owed to Laos in connection with any commercial activity by any third party located outside the Lao People's Democratic Republic." (Topic 5.) The document demand seeks documents from the Government, all departments, "evidencing or concerning commercial activities undertaken by Laos, whether independently or as a participant or shareholder in a corporation, limited liability company, partnership, joint venture, syndicate or other legal or informal combination with any third party." (Demand No.1—there are 22 more.) The Interrogatories ask Laos to "Identify all business activities, including without limitation, corporations, partnerships, joint ventures, and/or limited liability companies, that are domiciled or maintain an office outside Laos that are engaged in the mining, collection, development, or sale of any natural resources in the Lao People's Democratic Republic, and for each such company, the nature of the Companies activities and the amount of revenue paid to Laos by such company in 2008, 2009 and 2010." (Interrogatory 8). The deposition notice is attached as exhibit V, the document demand is exhibit W and the interrogatories is exhibit X. Is that what U.S Courts are to be used for now? Global fishing expeditions under the guise of New York Convention enforcement proceedings? This is forum shopping of the worst order. It will also require this Court to adjudicate the forthcoming motion to quash these extraordinary discovery demands.

9.       The Government of the Lao People's Democratic Republic respectfully reiterates its request this petition be dismissed on the grounds of *forum non conveniens.*

## II. The Jurisdictional Deficiencies That Make the Award Unenforceable.

10.       Petitioners' opposition on the merits over the two issues Laos has raised concerning jurisdiction contains only one point—an assertion that this Court cannot review the

jurisdictional decision of an arbitral tribunal because of the application of the arbitration rule known as 'competence-competence'.

11.    The Petitioners position is stated on page 15 of the Opposition, and repeated on every page thereafter. Petitioners stated:

> Here again, however, Laos' objections are fatally undermined by a clear body of Supreme Court and Second Circuit caselaw holding that, where, as here, the parties have authorized the arbitrators to resolve and determine the scope of their jurisdiction, the tribunal's resulting jurisdictional determinations are essentially beyond the scope of judicial scrutiny, since to permit a court to second guess a decision that the parties have expressly remitted to the arbitrators would constitute an impermissible abrogation of the parties' agreement.

12.    Petitioners' position is in clear contrast to the position Laos asserted in paragraph 66 of its moving memorandum, quoting the Second Circuit's decision in *Sarhank Group v Oracle Corporation*, 404 F.3d 657, 659 (2d Cir. 2005): "Under American law, whether a party has consented to arbitrate an issue is to be decided by the Court in which enforcement of an award is sought."

13.    Petitioners' error is a fundamental lack of understanding of the role of 'competence-competence' in the law of arbitration. There are two points in an arbitration when jurisdiction could be determined—at the outset of the request for arbitration and/or at the enforcement stage.

14.    In virtually all countries other than the United States, the default position that has been adopted to speed arbitration and to cut down on early court intervention is the doctrine known as 'competence-competence'. It means the arbitrators are competent to determine their own jurisdiction. The statutes of most countries, including England, Scotland, France, Switzerland, Germany, Uganda, Nigeria and Malaysia have all adopted this rule in their domestic arbitration statutes.[3]

15.    The U.S. Federal Arbitration Act, enacted in 1925, has no such authorizing provision. Therefore, alone among major arbitration venues, in the United States, the default position is that a party which wishes to contest arbitral jurisdiction upon receipt of a request to arbitrate has a right to seek a hearing in court to have a court (or jury) adjudicate if it consented under the contract at issue to arbitrate that dispute with that party. The exception to the U.S. default

---

[3] See *China MinMetals Materials Import & Export Co.Ltd., v Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003) for a full discussion of the 'competence-competence' rules around the world.

position is that parties waive their right to go to court by "clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Solution Co. Ltd.,* 398 F.3d 205, 208 (2d Cir. 2005). The cases petitioners cite, including *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 918 (1995) and its progeny, merely make this point.

16.     In all countries, including the United States, at the enforcement stage, courts have a duty to determine if in fact the arbitrators made the correct decision on jurisdiction—where the party made the objection to the arbitrators and thus preserved the objection. In the recent English case of *Dallah Estates v The Ministry of Religious Affairs, Government of Pakistan,* [2009] EWCA Civ. 755; [2009] WLR (D) 250, Lord Justice Moore-Bick explained the position in a case where arbitrators sitting in Paris decided their own jurisdiction under the French rule of 'competence-competence'. In the following enforcement proceeding in London, the Court of Appeal held the arbitrators' decision was not entitled to deference:

> Moreover I have to say that I find it difficult to understand exactly what Miss Heilbron had in mind when submitting that the court should accord deference to the tribunal's conclusions, particularly in view of the fact that she asserted that the principle was flexible in its application. If it meant no more than that the court should have regard to the Tribunal's reasoning, in reaching its own conclusion, I should have little difficulty with it, since the tribunal's reasons will almost invariably be before the court and will carry as much persuasive weight as their cogency gives them. That is not, however, what I understood her to mean, since it is essential to her argument that the court should accord great weight to the tribunal's conclusions unless they are clearly wrong.... It is for similar reasons that our courts have consistently held that proceedings challenging the jurisdiction of an arbitral tribunal under section 67 of the Arbitration Act involve a full rehearing of the issues and not merely a review of the arbitrators' own decision.

17.     That is the law at the enforcement stage in 'competence-competence' countries---and in the United States.

18.     Laos as noted above cited the controlling Second Circuit standard set forth in *Sarhank Group v Oracle Corp., supra.* Petitioners make no effort to distinguish *Sarhank Group*; they merely ignore it. Petitioners did cite, on page 14, another Second Circuit case, *Telenor Mobile Communications AS v. Storm LLC.,* 584 F.3d 396 (2d Cir. 2009) for the generic proposition that "...review of arbitral awards under the New York Convention is very

limited…"  *Telenor Mobile* had quite a march through the New York courts, resulting in four reported decisions.  Mysteriously, Petitioners only found three.[4]

19.     The fourth *Telenor* decision which they did not cite is quite on point.  The District Court said:

> Nor is the Court persuaded to defer to the tribunal's finding on the arbitrability of the dispute by Storm's prior concessions that the Tribunal had jurisdiction to determine its own jurisdiction. Storm's concession that the Tribunal had jurisdiction to determine its own jurisdiction, under the doctrine of 'competence-competence', which in turn is the basis for the UNCITRAL rules…did not restrict its ability to later request that this court independently review the tribunal's arbitrability decision…..under the competence-competence doctrine, 'the arbitrators' jurisdictional decision is subject to judicial review…
>
> ***
>
> Instead, such a challenge to the arbitrators' jurisdiction militates against deference to the arbitrators' judgment, and in favor of an independent inquiry into the arbitrability of the dispute, as the Court has an 'independent obligation to determine the threshold issue of arbitrability.' Id, citing *Sarhank Group v Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005). Thus, this Court will not 'merely defer to' the tribunal's findings on the issue of arbitrability, id, and Storm is entitled to an independent review on that issue. *Telenor Mobile Communications AS v. Storm LLC.*, 524 F.Supp.2d 332, 352 (S.D.N.Y. 2007).

20.     That District Court decision was affirmed by *Telenor Mobile Communications AS v. Storm LLC,* 584 F.3d 396 (2d Cir. 2009).  *Sarhank Group, supra*, and *Telenor, supra*, are the clear, recent, authoritative statements of the law in this Circuit on the standard of review of arbitral awards where a party has objected to the arbitrators' determination of jurisdiction in a 'competence-competence' proceeding.  Petitioners' argument must be rejected.

21.     The Petitioners have told this Court that it cannot review the arbitrators' decisions on jurisdiction.  The court must, they say, accept that HLL was a third party beneficiary to the PDA and was properly awarded jointly and severally over $56 million, because the "petitioners claimed that HLL was a proper party to an arbitration commenced under the PDA; the parties contested that claim extensively, and the tribunal accepted it."  Opposition, page 21/22, fn 12.  That position is, as discussed above, wrong in law but the consequence of being wrong in law is substantial—Petitioners have not provided this Court any explanation

---

[4] Petitioners refer to three *Telenor* cases on pages 2, 14 and 25.  Ironically, the citation to *Telenor* on page 2 is in support of an inference that Laos' counsel violated Rule 11.

of the underlying contract terms to support the Award that would allow this Court to say Laos intended to arbitrate Mining Contract disputes under the PDA with HLL as a third party beneficiary or that Laos intended to arbitrate PDA disputes with TLP and SEAP.

22.     The arbitral Award on its face records Laos' objections to the arbitrators' jurisdiction over the disputes arising out of the termination of the Mining Contracts and over the non-signatories HLL, TLP and SEAP.

23.     The arbitrators framed the jurisdictional issue at the outset, in the Parties' Contentions', Award, page 16.  The arbitrators said:

> The contentions of the parties are straightforward.  Claimants maintain that they are, respectively, a party to and an intended beneficiary of the PDA.... Respondent contends, first that neither Claimant has standing to bring the present claims.  GOL argues that TLL lacks capacity to enforce the PDA, that HLL has no right to claim under the PDA and that other affiliated organizations that are not parties to the arbitration, namely TLP and SEAP, have asserted no claims and have no right to claim under the PDA. Award, paras. 54 and 56.[5]

24.     On the first jurisdictional point, that Laos did not consent to arbitrate its disputes with TLL and HLL arising out of termination of the Mining Contracts, the arbitral decision was bereft of any analysis.  The arbitrators merely said: "The Tribunal agrees with Claimants that they have standing to bring these claims.  TLL is a party and HLL is an intended beneficiary of the PDA." Award, para. 65.

25.     On the second point, that the arbitrators awarded damages accumulated by non-signatories TLP[6] and SEAP, the tribunal again offered no explanation why the costs of four companies in the Siva group should be awarded to TLL and HLL, jointly and severally.

26.     Therefore neither the Petitioners nor the arbitrators have provided this Court with any reasoning or analysis of the contracts, cogent or otherwise, to support enforcement of this Award on the two jurisdictional issues presented by the Motion to Dismiss.

27.     Thus to enforce this Award, the Court's analysis requires an examination of the Award and the contracts to determine if in fact Laos expressed an intention to arbitrate disputes with

---

[5] Under paragraph 62, the arbitrators recorded Laos' objection to HLL's status as a claimant again: "The Respondent challenges HLL's standing because HLL is not a signatory of the PDA and even if HLL is an intended beneficiary of the PDA, HLL has no right to enforce the PDA because HLL's Lao investment license mentions only the second [Mining] contract and not the PDA."

[6] Petitioners misspoke again when they said on page 22, "Nor did Petitioners bring the arbitration in those companies' [TLP and SEAP] names, or seek to add them as parties." The arbitrators thought they did try to add TLP as a party: "The Tribunal rejects Claimants request to amend their claims, at the conclusion of the hearing, to add TLP as a party." Award, para. 66.

TLL and HLL under the Mining Contracts pursuant to the arbitration agreement in the PDA and whether Laos intended to arbitrate disputes under the arbitration agreement in the PDA with TLP and SEAP.  If the Court determines that Laos prevails on either prong of its submission, the Award cannot be enforced because the arbitrators did not provide clarity on what amounts of the $40 million of amalgamated costs were invested under which contractual concession or by which company.

28.     The cases in the Court of Appeals for the Second Circuit make clear that even where the claim to arbitrate is based on an implied duty, such as estoppel, "it is black letter law that an obligation to arbitrate can be based only on consent." *Sokol Holdings Inc v BMB Munai,* 542 F.3d 354, 358 (2d Cir. 2008).  The first point in this analysis is to examine the arbitrators expressed reason—that HLL was a third party beneficiary.  (It is doubtful whether traditional third party beneficiary status can confer arbitration rights upon a non-signatory.  Recent Second Circuit decisions call it an 'open question'.)[7]

29.     Petitioners (and the arbitrators) cite no case law on the issue of third party beneficiary. Petitioners merely say the case Laos cited, *Comer v. Micor Inc.* 436 F.3d 1098 (9th Cir. 2006) is inapposite because it involved a domestic arbitration and there was no indication the arbitrators were vested with competence-competence.  They are incorrect.  *Comer* is relevant because it focuses on the correct issue: is there any evidence the promissee intended the non-signatory to be the beneficiary of the arbitration agreement.

30.     Applying proper third party beneficiary analysis to these contracts and this Award proves there is no evidence Laos (and TLL) in signing the PDA intended to identify and make HLL a beneficiary of the PDA arbitration agreement.[8]

31.     The Restatement (Second) of Contracts Sec.302 states:

> [A] beneficiary of a promise is an intended beneficiary if recognition of a right in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary; or (b) the

---

[7] The Second Circuit has twice in the past three years said that when as here a non-signatory seeks to compel arbitration, 'it is an open question in this Circuit whether non-signatories may proceed on any theory other than estoppel.' *Baker & Taylor v Alphacraze.com Corp.*, 602 F.3d 486 (2d Cir. 2010) ; *Ross v American Express Co.*, 547 F.3d 137 (2d Cir. 2008).

[8] Petitioner makes the assertion that the inquiry Laos raises under the Convention relates to "whether the PDA is invalid". Opposition, page 16.  In Article V, the Convention is not referring to the container contract; it refers in Article II to the arbitration agreement and does so as well in Article V.  Laos is challenging the arbitrators' exercise of jurisdiction under the arbitration agreement contained in the PDA.

circumstances indicate that the promisee intended to give the beneficiary the benefit of the promised performance."

32.      HLL is not a beneficiary whose right to arbitrate "effectuates the intention of the parties" "where the circumstances indicate that the promisee –Laos—intended to give HLL the benefit of the right to arbitrate" under the terms of the PDA.

33.      The proof is in the separate contracts themselves.  Laos maintained the separate Mining Contracts with their separate dispute resolution clause even as it agreed to the arbitration clause in the PDA.

34.      There were two separate contractual schemes, the mining concession, governed by the Mining Contracts and the power plant concession, governed by the PDA.

35.      The Mining Contracts, executed in 1992, and amended in 1993, required TLL to create HLL as a Lao company for the exploitation of lignite deposits near Hongsa.  The PDA, executed in 1994, required TLL to create a separate economic vehicle, TLP, as a Lao company for exploitation of an electricity generating power plant at Hongsa.  If the power plant could be financed and built, which would be dependent on TLP signing a Power Purchase Agreement with the Thai government electricity board, HLL would sell lignite to the power plant owners.  If the power plant was never built, the parties intended the Mining Contracts would survive as an independent, self-contained agreement which would ensure that HLL could sell lignite to Thai power companies, as initially envisaged in 1992, before the discovery of lignite in quantities making the power plant commercially viable and before the 1993 MOU between Laos and Thailand, stating Thailand's interest in buying electricity from Laos. Award, para.18.

36.      The arbitrators noted the PDA was negotiated from March 1993 to its execution on 22 July 1994, a period of 16 months. Award, para. 12.  There were over 100 days of actual meetings between the parties during the negotiation period.[9]

37.      The arbitrators also noted the second Mining Contract was signed four months after the parties started negotiations over the terms of the PDA. Award, para. 11. Therefore it is a fact that the second Mining Contract was made with the knowledge of the pending PDA. Indeed the extension of the area of the lignite mining concession from 20 to 60 square km made in the second Mining Contract was in anticipation of the grant of the power plant concession in the PDA.  The arbitrators noted that relationship and that the parties when they

---

[9] Witness statement of Wirach Nimmanwathana, 17 December 2008, paragraphs 9 and 12. Ex.Y.

signed the second Mining Contract were actively planning the power plant concession and negotiating its terms: "That agreement [the Second Mining contract]…authorized TLL to proceed with feasibility studies regarding the construction of a lignite fired power station in the concession area." Award, para. 11.

38.    In the Motion to Dismiss, Laos relied upon PDA Articles 19.11 and 19.13, which make clear the separation the parties intentionally maintained between the two economic regimes, and they were clearly separate regimes.  These two articles expressly state that the Mining Contracts are still valid and separate and survive termination of the PDA.  Motion to Dismiss, page 14.

39.    Other sections of the PDA also make clear that the Mining Contracts survive intact.  In Article 2.4, it states that the mineral rights of "Hongsa Lignite and/or TLL are fully vested in Hongsa Lignite..."  In Article 2.4, sections (ii) and (iii), the PDA notes that there are yet roads "to be constructed by Hongsa Lignite..."  Finally in the PDA where TLL agrees with Laos to build a new road that is not described in the Mining Contracts, it is specifically stated in Article 4.12 of the PDA that the new road would be built "pursuant to Section 25 of the First Contract," and not pursuant to the PDA. This further exemplifies the clear demarcation, or dichotomy, between the rights and obligations under the PDA and under the Mining Contracts. The clear understanding is that this road, albeit a new road, was concerned primarily with infrastructure development relevant to the exploitation of lignite, and that it was not to be part of the "Complex" as "infrastructure necessary for the ownership, operation, and maintenance of the Plant(s)…" within the meaning of Article 1 of the PDA.

40.    The lignite deposits were enormously valuable to TLL and HLL and to Laos.  TLL owned 75% of HLL and Laos owned the remaining 25%.  As Laos owned 25% of HLL, its interests in the mining profits had to be protected.  Under the PDA, the commercial terms were entirely different than under the Mining Contracts. Under the PDA, Laos did not receive any ownership interest in the power plant project.

41.    Under the PDA, Laos was potentially to receive its benefit from granting the power plant concession in two forms, potential tax revenue and profit sharing.  Under Article 9.1 of the PDA Laos would receive sales taxes.  Under Article 9.2 of the PDA, Laos was to receive a share of net profits if certain conditions were met.

42.    As noted in Laos' Motion to Dismiss, the Mining Contracts were governed by the law of Laos; the PDA substantive contract terms are governed by the law of New York.  The

Mining Contracts have a separate dispute resolution clause, Article 31 which is entirely different from the arbitration agreement in the PDA.

43.     Importantly, the PDA has a specific remedy in Article 15(1) (b), where it is stated that "in the event of the termination of this Agreement, compensation shall be paid to TLL or the Government as the case may be as determined by the arbitration panel constituted in accordance with Article 14 hereof which shall include TLL's total investment cost plus a premium..." That remedy does not exist under the terms of the Mining Contracts. Instead, in Article 30 of the Mining Contracts, the parties agreed that "Conditions of cancellation of the agreement and dissolution of the operation or premature cancellation of the agreement shall be subject to the Law of Foreign Investment of Laos." But it is under this special PDA remedy clause that the arbitrators granted millions in "costs and a 10% premium" to TLL and HLL on costs expended under the Mining Contracts, without regard to what remedies were available under the Law of Foreign Investment of Laos.

44.     In their 16 months of negotiations, in 100 meetings, Laos never agreed to amend the Mining Contracts to arbitrate its termination dispute under the Mining Contracts with TLL and HLL under the arbitration clause of the PDA, never agreed to make the governing law the law of New York instead of the law of Laos, and never agreed to allow the arbitrators to "investment costs, plus a premium". The contracts on their terms prove that HLL was not an intended beneficiary of the arbitration agreement in the PDA.

45.     Throughout those hard negotiations, the parties expressly made a choice that the two different concessions themselves would survive as distinct contracts, that the governing law for the different concessions were to remain different, that the dispute resolution clauses were to remain different and that the remedy clauses would remain different. The above comparison of the materially different terms in the Mining Contracts and the PDA shows the intent of the parties, which was wrongfully and manifestly disregarded by the arbitrators.

46.     Further Laos never agreed to arbitrate any dispute of any kind with SEAP or TLP. Mr. Siva stated SEAP was not created until a year after the PDA was executed. [10] SEAP cannot be an intended beneficiary of preexisting contracts. The arbitrators wrongfully amalgamated their costs under the ill-conceived "group of companies" doctrine.

---

[10] Mr. Siva's Witness Statement, para 39 Ex.Z.

## <u>Conclusion</u>

The Government of the Lao People's Democratic Republic respectfully requests the Court to grant its Motion to Dismiss the Petition and to refuse enforcement of the arbitral Award.

Dated: October 27, 2010                                Respectfully submitted,

                                                By: <u>/s/ Anthony J. Hatab</u>
                                                    Anthony J. Hatab (AH-9825)
                                                    DRESSEL & HATAB, P.C.
                                                    6 East 45th Street, Suite 1605
                                                    New York, NY 10017
                                                    Tel.: (212) 980-0202
                                                    Fax: (212) 980-4297
                                                    E-Mail: hatablaw@verizon.net

                                                    *Attorneys for Respondent-Movant*
                                                    *Government of the Lao People's*
                                                    *Democratic Republic*