UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                                              |
THAI LAO LIGNITE (THAILAND) CO., LTD. &                       |
HONGSA LIGNITE (LAO PDR) CO., LTD.,                           |
                                                              |
                           Petitioners,                       |       10 Civ. 5256 (KMW) (DCF)
          -against-                                           |
                                                              |       OPINION and ORDER
GOVERNMENT OF THE LAO PEOPLE'S                                |
DEMOCRATIC REPUBLIC,                                          |
                                                              |
                           Respondent.                        |
                                                              |
--------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

      Thai Lao Lignite (Thailand) Co., Ltd., a company organized under the laws of Thailand,

and Hongsa Lignite (LAO PDR) Co., Ltd., a company organized under the laws of the Lao

People's Democratic Republic (collectively, "Petitioners"), moved for confirmation of an arbitral

award (the "Award") pursuant to the United Nations Convention on the Recognition of Foreign

Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 53, as implemented by the

Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*  The Government of the Lao People's Democratic

Republic ("Respondent" or the "Lao Government") opposed confirmation and moved to dismiss

the petition.

      On August 3, 2011, the Court granted Petitioners' petition to confirm the Award and

denied Respondent's motion to dismiss.  *See Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of

the Lao People's Democratic Republic*, No. 10 Civ. 5256, 2011 WL 3516154, at *1 (S.D.N.Y.

Aug. 3, 2011), *aff'd*, No. 11 Civ. 3536, 2012 WL 2866275 (2d Cir. Nov. 13, 2012).  The parties

have been engaged in protracted post-judgment discovery, supervised by Magistrate Judge Debra

Freeman, regarding Respondent's assets potentially available to satisfy the $56,210,000 judgment.[1]

Currently before the Court are Respondent's objections to discovery orders issued by Judge Freeman on May 29, 2012 (the "May 29 Order"), July 20, 2012 (the "July 20 Order"), and July 31, 2012 (the "July 31 Order"), which denied Respondent's request for a stay of the two prior orders.  [Dkt. No. 124].  Respondent also objects to an order issued on November 26, 2012 (the "November 26 Order") denying its request for a protective order, and Judge Freeman's December 17, 2012 denial of its request for a stay (the "December 17 Order").  [Dkt. Nos. 186, 192].  Finally, the Bank of the Lao People's Democratic Republic (the "Lao Bank") moved to intervene in the pending action, [Dkt. No. 116], and was granted permissive intervention by Judge Freeman on November 29, 2012.  [Dkt. No. 182].  The Lao Bank objects to the July 20 Order and a further discovery order issued on August 1, 2012 (the "August 1 Order").  [Dkt. No. 121].  Because the challenged orders arise from two different sets of facts, the Court divides its analysis into two parts.  The Court first addresses the objections from Respondent and the Lao Bank to the May 29, July 20, July 31, and August 1 Orders, and then turns to Respondent's objections to the November 26 and December 17 Orders.

## I.    STANDARD OF REVIEW

A magistrate judge's ruling on a nondispositive matter, including a discovery dispute,[2] may be set aside only if the district court determines the ruling to be "clearly erroneous or

---

[1] The original $56,210,000 judgment has been accruing interest at a rate of 9% per year, from November 4, 2009, to the date of satisfaction.  *See Thai Lao Lignite*, 2011 WL 3516154, at *21.  Given that more than two years have elapsed since the original judgment was entered, the total judgment now exceeds $70,000,000.

[2] Both Respondent and the Lao Bank claim that Judge Freeman's Orders are "legal conclusions denying FSIA immunity," which are dispositive rulings entitled to *de novo* review.  (Resp.'s Mem. of Law in Support 12 [Dkt. No. 126] ("Resp.'s First 72(a) Mem.")).  The Court disagrees.  Judge Freeman has made

contrary to law."  28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(b); *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) (holding discovery disputes to be nondispositive).  Under this highly deferential standard, magistrate judges "are afforded broad discretion in resolving nondispositive disputes and reversal is appropriate only if their discretion is abused."  *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 78 (2d Cir. 2012) (internal quotation omitted); *see also Edmonds v. Seavey*, No. 08 Civ. 5646, 2009 WL 2150971, at *2 (S.D.N.Y. July 20, 2009) (Baer, J.) (noting that the fact that "reasonable minds may differ on the wisdom of granting [a party's] motion is not sufficient to overturn a magistrate judge's decision").  A magistrate's ruling is contrary to law if it "fail[s] to apply or misapplies relevant statutes, case law, or rules of procedure," *Moore v. Publicis Groupe*, No. 11 Civ. 1279, 2012 WL 1446534, at *1 (S.D.N.Y. Apr. 26, 2012) (Carter, J.), and is clearly erroneous if the district court is "left with the definite and firm conviction that a mistake has been committed," *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal citation omitted). "The party seeking to overturn a magistrate judge's decision thus carries a heavy burden." *Samad Bros., Inc. v. Bokara Rug Co., Inc.*, No. 09 Civ. 5843, 2010 WL 5095356, at *1 (S.D.N.Y. Dec. 13, 2010) (Keenan, J.) (internal citation omitted).

Rule 72(a) precludes the district court from considering factual evidence that was not presented to the magistrate judge.  *See Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) ("The district court is not permitted to receive further evidence; it is bound by the clearly erroneous rule in reviewing questions of fact."); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*, 375 F. Supp. 2d 141, 158 (E.D.N.Y. 2005) (refusing to consider new evidence on

---

no conclusive rulings as to FSIA immunity.  Her Orders are nondispositive rulings concerning discovery, and the Court will review them only for clear error.

nondispositive issue based on reading of Rule 72 and lack of case law to the contrary).  The
Court accordingly confines its analysis to the factual record before Judge Freeman.

## II.       OBJECTIONS TO THE MAY 29, JULY 20, JULY 31, AND AUGUST 1 ORDERS

Respondent and the Lao Bank raise objections to a series of discovery rulings stemming
from Petitioners' discovery requests for information regarding Respondent's U.S. bank accounts
and payments Respondent received from various hydropower projects.  The Court overruled
Respondent's and the Lao Bank's objections orally at a conference on January 31, 2013.  [Dkt.
No. 199].  The following Opinion provides the reasons for these rulings.

### A.  Factual Background

On October 14, 2010, while the petition for confirmation of the Award and motion to
dismiss were pending, Petitioners served discovery requests and interrogatories on Respondent.
Petitioners primarily sought information about Respondent's assets located in the United States,
which may be used to satisfy the judgment if the Court confirmed the Award.  The Court referred
disputes regarding the scope of this discovery and other pretrial matters to Magistrate Judge
Freeman.  [*See* Dkt. No. 22].

This is not the first occasion that the Court has been called upon to settle Respondent's
objections to Judge Freeman's discovery orders.  On April 4, 2011, Judge Freeman ordered
discovery regarding Respondent's bank accounts (the "April 4 Order"), which Respondent
contended were immune from discovery and attachment under the Foreign Sovereign Immunities
Act of 1996 ("FSIA"), 28 U.S.C. §§ 1609-11.[3]  The Court dismissed Respondent's objections

---

[3] Under 28 U.S.C. § 1609, a foreign state's property is "immune from attachment, arrest and execution" unless it is subject to one of the exceptions laid out in sections 1610 and 1611.  Where, as here, a foreign sovereign has waived its sovereign immunity, *see Thai-Lao Lignite*, 2011 WL 3516154 at *7-8, its accounts may not be attached unless they are (1) located within the United States and (2) used for a commercial purpose.  28 U.S.C. § 1610.

and sustained Judge Freeman's order, noting that, although discovery in FSIA cases "should be ordered circumspectly" and should protect "legitimate claim[s] to immunity from discovery," Judge Freeman's orders satisfied this standard and imposed only a reasonable, even "minimal," discovery burden.  *See Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, No. 10 Civ. 5256, 2011 WL 4111504, at *6-7 (S.D.N.Y. Sept. 13, 2011) (Wood, J.). In addition, pursuant to Rule 37, the Court ordered Respondent to pay Petitioners' reasonable attorney's fees associated with litigating the objections because "merely filing an objection to that order does not excuse a party from complying with it."  *Id.* at *11.

The series of discovery disputes currently before the Court stems from discovery requests Petitioners submitted in September 2011 (the "Amended First Discovery Requests") and January 2012 (the "Amended Third Discovery Requests").  The Amended First Discovery Requests sought documents and information concerning Respondent's receipt of payments in U.S. dollars from its commercial hydropower projects.  (*See* Sun Decl., dated Sept. 6, 2012, Ex. A [Dkt. No. 147] ("Sept. 2012 Sun Decl.")).  The Amended Third Discovery Requests requested documents and information regarding Respondent's bank accounts in the United States (the "U.S. accounts") that Respondent's counsel, David Branson, had mentioned in the course of discovery. (*See id.* Ex. B).[4]  Specifically, the Amended Third Discovery Requests sought information and documents regarding Respondent's ability to control funds in the U.S. accounts, and regarding transfers from the U.S. accounts to Respondent.

Respondent objected to the requests, claimed that the U.S. accounts were immune from discovery, and disclosed only that the U.S. accounts are maintained by the Lao Bank.  (*See id.* ¶¶ 5-6; Exs. C, D).  After Respondent refused Petitioners' repeated offers to narrow the scope of its

---

[4] In response to previous discovery requests, Mr. Branson stated that "[t]here are one or more bank accounts maintained in the United States by separate legal entities or instrumentalities of the respondent but they are not maintained by respondent."  (Sun Decl. Ex. J, at 117:20-117:24).

requests, Petitioners sought leave to move to compel Respondent's compliance, and Respondent
reiterated its objections on immunity grounds.

1. The May 17, 2012 Conference

On May 17, 2012, Judge Freeman held a conference to consider the pending discovery
issues, including issues relating to the Amended First Discovery Requests and the Amended
Third Discovery Requests.  Judge Freeman acknowledged that she intended to order discovery
"circumspectly" and would "proceed with caution."  (Sept. 2012 Sun Decl. Ex. J, at 45:5-45:16).
After determining that information or assets located outside of the United States were not
automatically immune from discovery, Judge Freeman held that Petitioners could seek such
information so long as there was a "nexus to U.S. assets used for a commercial purpose."  (*Id.* at
45:4-45:16, 64:24-65:12).  Judge Freeman applied these principles in a series of rulings
regarding Respondent's discovery obligations, later memorialized in a written order (the "May
29 Order").

First, Judge Freeman ordered Respondent to produce all documents concerning
"Payments," which included any payment or revenue distribution made to Respondent in
connection with any of its thirteen commercial hydropower projects, provided the payments were
made in U.S. dollars and the documents indicated involvement by a bank located in the United
States.  (May 29 Order ¶ 1a, n.1 [Dkt. No. 95]).  If Respondent had any such documents in its
possession, it must also produce any project finance agreements pursuant to which the payments
were made, as well as any communications concerning the payments to the extent that they
evidenced communication with any bank office, branch, or other financial institution located in
the United States.  (*Id.* ¶ 1b, 1c).  Although Respondent had argued that these payments were
simply Electronic Fund Transfers ("EFTs"), or momentary transactions using U.S. banks as

6

intermediaries, Judge Freeman ruled that Petitioners should be able to have discovery about these payments to determine whether the payments were in fact EFTs or were more substantial transactions.  (Sept. 2012 Sun Decl. Ex. J, at 86:24-88:14).

Second, Judge Freeman ordered Respondent to disclose information concerning the Lao Bank's U.S. Accounts; information about Respondent's access to and authority over those accounts; and any payments made—or that would be made in the next twelve months—from the U.S. Accounts to Respondent.  (*See* May 29 Order ¶ 4; *see also* Sept. 2012 Sun Decl. Ex. J, at 124:14-125:24 (explaining rationale for order)).  The May 29 Order directed the parties to appear at a "follow-up discovery conference" on July 18.  (May 29 Order ¶ 8).

Respondent made a motion for "limited reconsideration"—later superseded by a motion for a stay—requesting additional time to comply with the May 29 Order.  (*See* Mot. for Reconsideration & Clarification of May 29 Order [Dkt. No. 97]).  Respondent specifically asserted that it "ha[d] decided not to appeal" the May 29 Order.  (Resp.'s Mem. in Support at 1 [Dkt. No. 98]).  Judge Freeman extended the production deadline from June 18 until July 13, and Respondent submitted its answer on that date.  As to the hydropower payments and associated documentation, Respondent claimed that it "has no such documents in its possession, custody or under its control."  (Sept. 2012 Sun Decl. Ex. K, at 1).  In response to the interrogatories requesting information on the U.S. accounts to which Mr. Branson had referred, Respondent answered that "[n]o Respondent personnel have knowldge [sic] of the Central Bank's bank accounts maintained in New York; no Respondent personnel are authorized to access or direct disposition of funds maintained in those accounts and no Respondent personnel have access to the records of those accounts."  (*Id.*).

These assertions were supported by a notarized document and a letter from Mr. Branson listing the Laotian officials with whom he had met to answer the discovery requests. (*Id.*). Aside from these brief statements, Respondent did not produce any documents or other information in response to the May 29 Order.

On July 17, Petitioners wrote to Judge Freeman to say that Respondent's submissions were "simply impossible to accept as credible," and provided documentary evidence to support this contention. (*Id.* Ex. L). First, Petitioners provided a Lao statute establishing the Lao Bank as equivalent to a government ministry (presumably indicating a close relationship with Respondent), requiring the Lao Bank to hold Respondent's assets if they are maintained outside of Laos, and providing Respondent a wide-ranging statutory right to request information of the Lao Bank.[5] (*Id.*). Petitioners also supplied a newspaper article showing that Respondent will receive approximately $27 million in royalties from one hydropower project, Nam Theun 2, and supplied transaction reports from Standard Chartered Bank showing ongoing royalty payments from the Nam Theun 2 project passing through an account maintained in Respondent's name at its New York branch. (*Id.*).

## 2. The July 18 Conference

In accord with terms of the May 29 Order, Judge Freeman held a second discovery conference on July 18, 2012 to address Petitioners' concerns regarding Respondent's incomplete submissions. (*See* Sept. 2012 Sun Decl. Ex. N). With respect to Respondent's assertion that it had no documents concerning the hydropower project payments, Judge Freeman explained that Rule 34 requires parties to turn over all documents in their "possession, custody, and control." Fed. R. Civ. P. 34(a)(1). In the Second Circuit, this concept encompasses documents to which a

---

[5] Although this Opinion touches on the legal relationship between the Lao Bank and the Lao Government, it is not intended to be determinative of that question for purposes of proving an alter ego relationship. Any discussion regarding this topic applies only for purposes of discovery.

party has "access and the practical ability to possess." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 530 (S.D.N.Y. 1996) (Sweet, J.) (noting that production is required under Rule 34 if a party has a "legal right to obtain" documents).  Thus, in order to ensure Respondent had fully complied with Rule 34, Judge Freeman asked Respondent whether it had requested payment records from any of its banks.

     Mr. Branson, the attorney who supervised Respondent's efforts to comply with Petitioners' requests, was not present at the July 18, 2012 conference; Anthony J. Hatab, the attorney who appeared on Respondent's behalf, did not know whether such inquiries had been made.  (Sept. 2012 Sun Decl. Ex. N, at 36:6-37:4).  Petitioners provided Judge Freeman with news articles indicating that Respondent's hydropower projects were worth hundreds of millions of dollars, as well as documents showing payments related to the projects, handled by the Lao Bank, which passed through a bank in New York.  (*Id.* Ex. L).  In light of this evidence, Judge Freeman ordered Respondent to request documents concerning the hydropower payments from the Lao Bank.

     Judge Freeman had difficulty accepting Respondent's statement that "no Respondent personnel" had any knowledge of, authority over, or access to records of the U.S. accounts.  (*See, e.g.*, *id.* at 40:4-41:6, 60:3-61:14).  Judge Freeman questioned whether the Government could maintain a bank account of which no member of the Government had any knowledge, nor the ability to access, noting that "an account holder has to have some authority" over its funds, (*id.* at 61:15-61:18), and that "somebody [in the Government] had to tell [Mr. Branson]" about the U.S. Accounts.  (*Id.* at 64:11-64:22).  Given that Respondent's answers flatly contradicted this commonsense proposition, Judge Freeman ordered Respondent to produce either the account

records or a sworn affidavit from specified Lao Government officials[6] explaining Respondent's relationship to the Lao Bank that would support Respondent's contention that it has no knowledge over its funds held there.  (*Id.* at 66:1-66:7; 79:2-79:13; July 20 Order ¶ 4).  Judge Freeman memorialized these directives in a July 20, 2012 written order (the "July 20 Order").

On July 24, Petitioners sent Judge Freeman a letter requesting that her earlier order be clarified to include "all documents evidencing or concerning the bank accounts maintained in the United States referred to in Mr. Branson's averment," including identifying the accounts themselves.  (Endorsed Letter from James E. Berger to Magistrate Judge Debra C. Freeman, [Dkt. No. 113] ("Aug. 1 Order")).  Judge Freeman granted Petitioners request on July 31, and the order was entered on August 1 (the "August 1 Order").

On July 27, the date by which Respondent was required to file responses to the July 20 Order, Respondent submitted a letter to Judge Freeman requesting stays of the May 29 and July 20 Orders and announcing its intention to object to those orders.  (*See* Sept. 2012 Sun Decl. Ex. O).  Judge Freeman denied Respondent's request for a stay on July 31, and Respondent filed its objections to the May 29 and July 20 Orders, as well as its objection to the July 31 denial of a stay, on August 7.  [Dkt. No. 126].  On August 3, the Lao Bank moved to intervene and asserted objections to the Paragraphs 2-4 of the July 20 Order and the entirety of the August 1 Order.

---

[6] The July 20 Order direct Respondent to provide the requested information or

> [S]ubmit a sworn affidavit or declaration under penalty of perjury from the Lao Deputy Prime Minister, the Governor of the Central Bank, or the Minister of Finance (each of whom, according to Petitioners, is required by Article 10 of the Central Bank Law to be both a member of the Board of Directors of the Bank and a Government official), explaining how Respondent may, in any way, come to be aware of any funds deposited into, or held by, the Central Bank for the benefit of Respondent; and through what means, and at whose direction, any of such funds may come to be disbursed for any government purpose.

(July 20 Order ¶ 4).

[Dkt. Nos. 116, 117, 121].  Judge Freeman granted the Lao Bank's motion to intervene on November 29.  [Dkt. No. 182].  Finally, on September 6, Petitioners filed responses opposing both sets of objections and cross-moved for sanctions and civil contempt against Respondent based on Respondent's failure to comply with the discovery process.  [Dkt. No. 144].

After Petitioners wrote to Judge Freeman requesting assistance in mandating compliance with other discovery orders, *see infra* Part III, this Court convened two conferences, on January 15, 2013 and January 31, 2013, to discuss the status of discovery and potential sanctions against Respondent.  At the January 31 conference, the Court overruled Respondent's objections to the May 29, July 20, and July 31 Orders as well as the Lao Bank's objections to the July 20 and August 1 Orders.  (*See* Jan. 31, 2013 Hearing Trans., at 5:10-5:16 [Dkt. No. 199]).

To date, Respondent's only efforts to comply with the outstanding discovery orders has been a submission from Mr. Branson stating that Respondent could not obtain records concerning the hydropower payments because the two Lao banks administering the payments had "refused" to provide Respondent with the requested information.  (*See* Sept. 2012 Sun Decl. Ex. Q at 4).  As before, this information was provided in a letter signed by Mr. Branson, notarized by a Lao notary, but not sworn.  (*See id.*).  Respondent did not provide affidavits from the Lao Officials designated in the July 20 Order.  (July 20 Order ¶ 4).  Respondent did include a document apparently showing receipt of payments from one hydropower project, but the document is primarily in Lao and no English translation was provided.  (Sept. 2012 Sun Decl. Ex. Q).

## B.  Respondent's Objections to the May 20, July 20, and July 31 Orders

On August 7, 2012, Respondent filed objections to the May 29 and July 20 Orders, arguing (1) that the Orders violate the principle that discovery in FSIA cases should be ordered

circumspectly; (2) that property immune from attachment under FSIA is also immune from discovery; and (3) that Respondent cannot be required to produce materials from an independent sovereign instrumentality.  [Dkt. Nos. 125, 126, 127].  On August 16, Respondent filed separate objections to the July 31 Order denying its request for a stay of the May 29 and July 20 Orders. [Dkt. Nos. 128-35].  For the following reasons, Respondent's objections to the May 29, July 20, and July 31 Orders are overruled and the Orders are affirmed.

1.  Timeliness

Petitioners first argue that Respondent's objections are untimely.  A party must file its objections to a magistrate judge's orders within 14 days after being served with a copy.  Fed. R. Civ. P. 72(a).  Respondent did not object to the May 29 Order within 14 days.  (*See* Resp.'s Mem. in Support 1 [Dkt. No. 98] (noting that Respondent "ha[d] decided not to appeal the Court's Order dated May 29, 2012")).  Respondent was served with Judge Freeman's July 20 Order on July 23, when the Order was filed electronically.  (Dkt. No. 111; *see also* Hatab Decl. Ex. Q (ECF filing notice dated July 23, 2012)).  This means that Respondent's objections to the July 20 Order were due on August 6, and Respondent's Objections are dated August 6.[7]  Finally, Respondent submitted objections to the July 31 Order denying its request for a stay on August 14, and Petitioners do not challenge the timeliness of these objections.

The Court agrees with Petitioners that Respondent waived its opportunity to object to the May 29 Order.  Parties who fail to object to a magistrate's ruling within 14 days waive their opportunity to challenge that ruling.  *See* Fed. R. Civ. P. 72(a) ("A party may not assign as error a defect in the [magistrate's] order not timely objected to."); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2012) ("[F]ailure to object timely to a magistrate's report operates as

---

[7] Petitioners note that, although Respondent's submission is *dated* August 6, it was not actually *filed* until August 7. While the Court disapproves of Respondent's apparent disregard for deadlines, it is not convinced the discrepancy was intentional.

a waiver of any further judicial review of the magistrate's decision." (internal citation and

quotation omitted)).  Respondent's attempt to analogize to appellate procedure is unavailing, and

the Court rejects Respondent's contention that the July 20 Order somehow revived its time to

object to the May 29 Order.[8]  Respondent specifically chose not to object to the May 29 Order.

This decision constituted a waiver of Respondent's right to object, and the Court thus dismisses

Respondent's objections to the May 29 Order as untimely.

Petitioners also argue that Respondent's objections to the July 20 Order are untimely.

According to Petitioners, the July 20 Order was not a new ruling, but simply a clarification of

Respondent's existing obligations under the May 29 Order.  (Pets.'s Mem. of Law in Opp. 16

[Dkt. No. 139] ("Pets.'s Mem.")).  Petitioners argue that, by waiving its objections to the May 29

Order, Respondent also waived any objections to the July 20 Order because it was an extension

of the prior order.  For its part, Respondent contends that its failure to object to Judge Freeman's

initial order did *not* waive its ability to challenge the July 20 Order because that Order

constituted a new ruling subject to new challenges. (Resp.'s Mem. of Law in Support 10 [Dkt.

No. 126] ("Resp.'s First 72(a) Mem.")).  Although the Court is persuaded that the July 20 Order

was intended to obtain Respondent's compliance with the May 29 Order and imposed no new

obligations, the Court considers Respondent's objections on their merits because there is

conflicting case law regarding waiver for failing to object to a prior order.  *Compare Carson v.*

*Patterson Dental Supply, Inc.*, No. 08-cv-653, 2009 WL 3127755, at *3-4 (S.D. Ohio Sept. 25,

2009) (finding objection untimely under 72(a) when party failed to challenge ruling in prior

---

[8] Respondent also argues that Judge Freeman considered discovery to be a "fluid process," and
consequently the May 29 Order was not intended to be a final disposition of Petitioners' requests.
(Resp.'s First 72(a) Mem. 10).  The Court disagrees, and finds that the May 29 Order was intended to be
final as to the issues that it addressed.  The subsequent rulings were required only because Respondent
failed to comply with the May 29 Order, not because Judge Freeman intended the May 29 Order to be an
interim ruling.

order addressing the same topic), *and Partminer Worldwide, Inc. v. Siliconexpert Techs., Inc.*,
No. 09-cv-586, 2011 WL 587971, at *5-6 (D. Col. Feb. 9, 2011) (holding objections untimely
when party had an opportunity to raise them in a prior filing), *with S.E.C. v. McNaul*, 277 F.R.D.
439, 442 (D. Kan. 2011) (holding that Rule 72(a) "does not contemplate waiver by failure to
object to a previous order discussing the same issue").

2.  Clear Error

Because Respondent's objections to the May 29 Order were untimely, the Court will
consider only Respondent's objections to the July 20 and July 31 Orders.

i.      *Respondent's Objections to the July 20 Order*

Respondent contends that "discovery should be ordered circumspectly" in FSIA cases
and that Judge Freeman's discovery rulings violate the FSIA because "[i]f the property in
question is immune from attachment, it are [sic] also immune from discovery."  (Resp.'s First
72(a) Mem. 2.  Respondent applies this principle to the portions of the Order directing discovery
relating to payments from its hydropower projects, including account information about
purported EFTs.  To the extent that the July 20 Order seeks information from "sovereign
agencies and instrumentalities," Respondent believes such discovery is unwarranted because
such instrumentalities are "distinct and independent from their sovereign."  (*Id.*)  Finally, in its
reply brief, Respondent appears to abandon its FSIA arguments and instead argues that
Respondent has already supplied all of the information Petitioners requested and that Petitioners
discovery requests did not identify property that could potentially be attached.  (Resp.'s Reply
Mem. of Law in Further Support [Dkt. No. 151] ("Resp.'s Reply Mem.")).  Neither argument has
merit.

In their briefs, Respondent presents complex issues of foreign sovereign immunities law
addressing whether particular property is attachable under the FSIA.  But the Second Circuit

recently held that "the district court's power to order discovery to enforce its judgment does not derive from its ultimate ability to attach the property in question but from its power to conduct supplementary proceedings, involving persons indisputably within its jurisdiction, to enforce valid judgments." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012).  In *EM*, Argentina made arguments parallel to those that Respondent presents in this case, contending that "the normally broad scope of discovery in aid of execution" should be limited by "principles of sovereign immunity."  *Id.*  Because Argentina believed its property abroad was "categorically immune from attachment," Argentina argued that the district court had no power to order discovery as to those assets.  *Id.*  The Second Circuit flatly rejected Argentina's arguments, upheld the discovery orders at issue, and emphasized that "[w]hatever hurdles" the plaintiff may face before being able to attach Argentina's property abroad, "it need not satisfy the stringent requirements for attachment in order to simply receive information about Argentina's assets."  *Id.* at 209.  The Second Circuit further held that the necessity to order discovery "circumspectly" does not apply in cases where courts have already established jurisdiction over a foreign sovereign.  Rather, where a party seeks discovery from a defendant "over which the district court indisputably has jurisdiction," discovery may be ordered broadly in order to enforce valid judgments.  *Id.*

The Court finds that this holding forecloses Respondent's sovereign immunity objections to Judge Freeman's discovery orders.  The Second Circuit specifically rejected Respondent's principal case support for its position, *Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011).  *See EM*, 695 F.3d at 209 ("We respectfully disagree [with *Rubin*] to the extent it concluded that the district court's subject matter jurisdiction over a foreign sovereign was insufficient to confer the power to order discovery from a person subject to the court's

jurisdiction that is relevant to enforcing a judgment against the sovereign."). This Court has already held that it has jurisdiction over Respondent. *See Thai-Lao Lignite*, 2011 WL 3516154, at *7-8 (noting that Respondent "affirmatively waived" sovereign immunity). Thus, discovery may proceed as broadly as it would in a typical post-judgment context without regard to immunity issues.

Although Petitioners will likely have to grapple with sovereign immunity issues in order to ultimately attach Respondent's assets, at this point, they need not prove that the assets about which they seek information are subject to attachment. After all, the very purpose of Petitioners' discovery requests are to determine which funds, if any, are attachable under the FSIA. Forcing Petitioners to show that property is attachable before permitting them to gain any information about Respondent's assets would present an insurmountable Catch-22 for judgment creditors seeking to enforce a valid judgment.

The Court also rejects Respondent's argument that the July 20 Order is directed to independent entities. Petitioners have not directed discovery at third parties, but have simply asked Respondent to provide account information about its own assets, whether held by the Lao Bank or some other institution. Judge Freeman did not find Respondent's assertions that it had no way to access information about its own accounts credible, and the Court finds no clear error in this conclusion. If and when Petitioners actually seek to attach funds the Lao Bank believes to be its own property subject to sovereign immunity, it should raise such a challenge at that time. *See Karaha Bodas Co., LLC. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Pertamina)*, 313 F.3d 70, 81-82 (2d Cir. 2002) (holding that non-parties can appeal if they own property subject to an attachment order); *Olympic Chartering S.A. v. Ministry of Indus. & Trade of Jordan*, 134 F. Supp. 2d 528 (S.D.N.Y. 2001) (Wood, J.) (considering motion by Jordanian

Central Bank where Bank claimed funds levied to execute judgment were drawn from its proprietary accounts, not Jordanian accounts, and were thus immune under the FSIA).  As for the other entities mentioned by Respondent in its brief, the Court notes that the district court may direct subpoenas at independent entities with no claims to sovereign immunity.  *EM*, 695 F.3d at 209 (upholding district court's power to issue subpoenas to commercial banks in FSIA case where jurisdiction over sovereign had been established).

Finally, the Court rejects Respondent's objections insofar as they claim they have already produced all materials responsive to Petitioners' requests.  Judge Freeman concluded that their responses were incomplete, and the Court finds no clear error in this finding.  Indeed, the Court agrees with Judge Freeman that "an account holder has to have some authority over its funds," (Sept. 2012 Sun Decl. Ex. N, at 61:15-61:18), and that Respondent's statements to the contrary strain credulity.  Petitioners presented ample evidence to justify further discovery into the hydropower payments and Respondent's accounts.  The Court finds no clear error in Judge Freeman's decision to order further discovery based on the information provided by Petitioners and Respondent's threadbare responses.

> ii.    *Respondent's Objections to the July 31 Order Denying Its Request for a Stay*

Instead of complying with the July 20 Order, Respondent requested a "last minute" stay on July 27, the date by which it was supposed to comply with Judge Freeman's orders.  (July 31 Order 2 [Dkt. No. 112]).  Judge Freeman denied Respondent's request for a stay, and ordered Respondent to comply with the terms of the July 20 Order or risk sanctions.  (*Id.*)  Respondent now objects to this denial of its request for a stay, making essentially the same arguments it made in its objections to the July 20 Order.  For similar reasons, the Court rejects Respondent's objections and finds no clear error in Magistrate Judge Freeman's July 31 Order.

Respondent again argues that complying with the discovery obligations imposed on it in the July 20 Order will cause substantial harm because the assets subject to discovery are protected by sovereign immunity.  Respondent also contends that Magistrate Judge Freeman was "willfully blind" to evidence indicating that various assets to which discovery is directed are not attachable under FSIA.  (Resp.'s Mem. of Law in Support 7-8 [Dkt. No. 134] ("Resp.'s Second 72(a) Mem.")).  The Court notes at the outset that all of the case support for Respondent's arguments concern whether the property at issue is *ultimately* attachable, not whether such property can be *subject to discovery* to determine whether it may ultimately be attachable.  As discussed previously, the Second Circuit's holding in *EM* conclusively held that a court should not conflate these two inquiries.  Respondent must comply with discovery regarding its assets, regardless of whether those assets are ultimately attachable, pursuant to the Court's inherent discovery powers.  *See EM*, 695 F.3d at 208-09.  Further, the evidence to which Respondent argues Judge Freeman was "willfully blind" was not available when she made her rulings.  (Pets.'s Mem. 19).  Given that Rule 72(a) limits a district court's consideration of a magistrate's rulings to whether the decision was clearly erroneous based on the evidence and information before her, the Court does not consider the new information that Respondent now presents.

Both parties also make arguments regarding what harm would have resulted, or will result if Judge Freeman were to have issued the stay.  (*See* Pets.'s Mem. 19; Resp.'s Second 72(a) Mem. 7-8).[9]  After reviewing the submissions, the Court is not "left with the definite and firm conviction that a mistake has been committed," *Easley*, 532 U.S. at 235, and thus finds no clear error in Judge Freeman's rulings.  The Court finds also that Petitioners would suffer

---

[9] The Court notes that harm does not factor into a court's decision of whether not to stay discovery.  To stay discovery proceedings, the moving party must show "good cause," or that "resolution of a preliminary motion may dispose of an entire action."  *Siemens Credit Corp. v. Am. Tran. Ins. Co.*, No. 00 Civ. 0880, 2000 WL 534497, at *1 (S.D.N.Y. May 3, 2000) (Jones, J.).

significant harm from further stalling these already prolonged post-judgment discovery proceedings.  Given the need for a speedy resolution of this protracted litigation and the lack of any compelling reason for Respondent not to comply with discovery orders, the Court overrules Respondent's objections to the July 31 Order denying a stay and sustains Judge Freeman's July 31 Order.

### C.  The Lao Bank's Objections to Paragraphs 2-4 of the July 20 Order and the August 1 Order

The Lao Bank has intervened for the limited purpose of objecting to portions of Judge Freeman's discovery orders "to the extent that these orders require the production of documents or information related to the Lao Central Bank or its property."   (Obj. of the Bank of the Lao People's Democratic Republic 1 [Dkt. No. 121] ("Lao Bank Obj.")).   In particular, the Lao Bank objects to paragraphs 2-4 of the July 20 Order, which direct Respondent to produce information regarding hydropower payments passing through U.S. bank branches and account information from the U.S. accounts or an affidavit showing why such information is unavailable; and to the August 1 Order approving Petitioners' request for information about Respondent's assets.  For the following reasons, the Court overrules the Lao Bank's objections and sustains Judge Freeman's Orders.

#### 1.  Timeliness

Petitioners argue that the Lao Bank's objections to the July 20 Order are untimely for the same reasons it claims Respondent's objections are untimely.  Specifically, Petitioners contend that the July 20 Order was intended to enforce the provisions of the May 29 Order, and did not impose any new obligations.  In Petitioners' view, the July 20 Order was "specifically intended to provide Respondent with an opportunity to avoid a finding that it had violated the May 29 Order."  (Pets.'s Mem. 25).  The Court agrees with Petitioners that the July 20 Order was

intended to enforce Respondent's compliance with the May 29 Order, but nonetheless considers the Lao Bank's objections on their merits. Judge Freeman's expansion and clarification of her original order at the July 18 conference made the precise scope of authorized discovery more apparent, and the Court finds it plausible that the Lao Bank did not realize it needed to object until that time.

### 2. Contrary to Law

The Lao Bank's arguments fall into two main categories: (i) legal arguments asserting they are immune from discovery altogether based on various sovereign immunity principles, and (ii) arguments applying those principles to the facts underlying the Orders at issue, which claim the property about which Petitioners seek discovery belongs to the Lao Bank, and not to the Lao Government. The Court addresses each in turn.

### i. *Sovereign Immunity Principles*

As discussed above, the Second Circuit recently held that if a foreign sovereign has waived sovereign immunity, district courts may proceed with discovery regarding its assets irrespective of whether the property is ultimately attachable. *EM*, 695 F.3d at 208. Indeed, a party "need not satisfy the stringent requirements for attachment in order to simply receive information about [a sovereign nation judgment debtor's] assets." *Id.* at 209. The Lao Bank, however, characterizes the appropriate standard as requiring Petitioners to "identify specific property" and then "plausibly allege that an exception" to FSIA immunity applies. (Lao Bank's Obj. ¶ 27 (citing *Rubin*, 637 F.3d at 797)). After *EM*, it is clear that this is not the standard Petitioners must satisfy in order to obtain discovery regarding the Lao Government's assets. *See EM*, 695 F.3d at 208-09.

However, *EM*'s applicability is less clear with respect to the Lao Bank, because, unlike the Lao Government, the Lao Bank has not waived its sovereign immunity. "Government

instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 626-27 (1983).  The Lao Bank has provided ample statutory evidence to trigger a presumption of independence from the Lao Government, which Petitioners can only overcome by proving either (1) that the Lao Bank is "so extensively controlled" by the Lao Government that a principal/agent relationship is created (an alter ego theory), or (2) that recognizing the Lao Bank as a separate entity "would work fraud or injustice." *Id.* at 629. Petitioners have not yet made such a showing, so the Court assumes that the Lao Bank is a separate entity independently entitled to sovereign immunity protections under the FSIA.

Because the Court has not established jurisdiction over the Lao Bank as a separate entity, it must order discovery conservatively with respect to the Lao Bank.  *See EM*, 695 F.3d at 210 ("[A] court must be 'circumspect' in allowing discovery before the plaintiff has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA.").  While a district court can approve broad discovery requests (within the bounds of relevance, *id.* at 209) pertaining to the Lao Government, the Lao Bank's sovereign immunity "protects [it] from the expense, intrusiveness, and hassle of litigation," and the Court must be "circumspect" in what discovery it permits.  *Id.* at 210; *see also Bancec*, 462 U.S. at 626-27.   The Second Circuit's holding in *EM* was supported by the fact that the banks to which discovery was directed were commercial banks with "no claim to sovereign immunity, or to any other sort of immunity or privilege."  *EM*, 695 F.3d at 210.  Although where, as here, the bank targeted has a claim to immunity, and thus the scope of discovery must be narrowed to avoid intruding on the Lao Bank's sovereign immunity, such discovery may nonetheless proceed so long as it is ordered

with appropriate consideration for comity concerns.  *See First-City, Texas-Houson, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998).

Finally, the Lao Bank notes that central bank assets are categorically immune from attachment under the FSIA so long as the funds "are held for [the central bank's] own account." 28 U.S.C. § 1611(b)(1).  This immunity protects central bank property regardless of the bank's independence from the sovereign state.  *See NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 187-88 (2d Cir. 2011) ("We hold that…§ 1611(b)(1) immunizes property of a foreign central bank or monetary authority held for its own account without regard to whether the bank or authority is independent from its parent state pursuant to *Bancec*."), *cert. denied*, 132 S. Ct. 1133 (2012).  To rebut this presumption, Petitioners must show, with specificity, "that the funds are not being used for central banking functions as such functions are normally understood."  *Id.* at 194.  Under this standard, the Court agrees that specific details of accounts held by the Lao Bank are immune from discovery as well as attachment; indeed, as the Second Circuit noted in *EM*, "discovery and immunity are almost invariably intertwined" where the court's jurisdiction over a sovereign is not yet established.  *EM*, 695 F.3d at 210.  With these principles in mind, the Court turns to the Lao Bank's specific complaints regarding the July 20 and August 31 Orders.

> ii.      *Sovereign Immunity Principles Applied to the Circumstances of the July 20 and August 1 Orders*

The Lao Bank argues that the July 20 and August 1 Orders are directed at Lao Bank property, and are consequently prohibited by the immunity principles discussed above. Petitioners counter that the discovery they seek is wholly directed at Respondent, not the Lao Bank, and thus permitted under *EM*'s approval for searching discovery where a sovereign has waived its immunity.  To support its position, the Lao Bank has adduced a declaration from Oth

Phonhxiengdy, the Deputy Director General of the Banking Operations Department of the Lao

Bank.  (Phonhxiengdy Decl. [Dkt. No. 123]).[10]  Mr. Phonhxiengdy claims that the U.S. Accounts

to which Mr. Branson referred during discovery, and regarding which the July 20 Order directed

Respondent to produce information, are actually held in the name of the Lao Bank.  (*Id.* Ex. B).

The Court agrees with Petitioners that this evidence does not conclusively establish that

these accounts are the Lao Bank's property, and not Respondent's.  Evidence provided by

Petitioners shows that the Lao Bank is obligated by law to act as a custodian for the Lao

Government's assets abroad.  (*Id.* ¶ 12 (citing Law on the Bank of the Lao PDR, Law No. 5, art.

47 (Oct. 14, 1999, as amended))).   Petitioners are thus entitled to discovery regarding

Respondent's accounts, even though they may be held in the name of the Lao Bank.

Furthermore, the Court finds that, to the extent that these requests require tangential involvement

from the Lao Bank, this burden is reasonable and well within the parameters of "circumspect"

discovery required by the FSIA.  Moreover, Judge Freeman had access to this information when

she made her rulings, (*see* Sun Decl. Exs. C, D, L), and the Court is not left with the "definite

and firm conviction that a mistake has been committed."  *Easley*, 532 U.S. at 242.

Consequently, the Court affirms the July 20 Order, overrules the Lao Bank's objection, and

directs Respondent to produce information regarding these accounts or show good cause why it

cannot do so in accord with the terms laid out in the July 20 Order.

The Court also rejects the Lao Bank's objections to the August 1 Order.  Although the

Lao Bank characterizes the Amended Third Discovery Requests as seeking information about the

Lao Bank's accounts, the document request at issue references only Respondent's accounts.

---

[10] As noted above, Rule 72(a) restricts the Court's review to those materials that were before Judge
Freeman at the time she made her decision.  *See Haines*, 975 F.2d at 91.  Because the admissibility of new
evidence to decide an *intervenor*'s objections is not as clear, the Court considers Mr. Phonhxiengdy's
declaration.

(*Compare* Letter from James E. Berger to Magistrate Judge Freeman, dated July 24, 2012 Ex. B ¶ 2 (seeking discovery on "'the bank accounts maintained in the United States' referred to in the Averment"), *with* Lao Bank's Obj. ¶ 20 (referring to these accounts as "accounts in the name of the Lao Central Bank")).  As discussed above regarding the Standard Chartered Accounts, Petitioners—despite the Lao Bank's assertions—are not requesting information about the Lao Bank's accounts, but about Respondent's accounts.  Moreover, Petitioners have withdrawn Paragraphs 2(a)-2(c) of the Amended Third Discovery Requests, which significantly narrows the scope of the request.  (Pets.'s Mem. 23).  The Court believes this imposes a reasonable, even minimal, discovery burden on the Lao Bank and affects them only tangentially.  Given these findings, the Court finds no clear error in Judge Freeman's rulings.

In sum, the Lao Bank has not shown that Judge Freeman's rulings were contrary to law, nor that they were clearly erroneous.  The Court is confident that, in managing the discovery process, Judge Freeman will balance the important interest in respecting the Lao Bank's sovereign status with the concomitantly important interest in permitting Petitioners to obtain information necessary to enforce a valid judgment issued by this Court.

III.    RESPONDENT'S OBJECTIONS TO THE NOVEMBER 26 AND DECEMBER 17 ORDERS

Also before the Court are Respondent's objections to two orders pertaining to various depositions that Petitioners seek from Lao officials in the United States.  The Court overrules Respondent's objections and finds that Judge Freeman's rulings were neither clearly erroneous nor contrary to law.

    A.    **Factual Background**

On April 4, 2011, Judge Freeman ordered discovery regarding Respondent's bank accounts (the "April 4 Order"), which Respondent contended were immune from discovery under the FSIA.  The Court dismissed Respondent's objections, sustained Judge Freeman's ruling, and ordered Respondent to pay Petitioners' reasonable attorney's fees associated with litigating the objections because "merely filing an objection to that order does not excuse a party from complying with it."  *Thai Lao Lignite*, 2011 WL 4111504, at *11.  Even after its objections were overruled, Respondent failed to produce any documents in response to the April 4 Order until November 14, 2011.  (Sun Decl., dated Jan. 2, 2013, Ex. A [Dkt. No. 190] ("Jan. 2013 Sun Decl.").  After Petitioners complained that Respondent's responses were incomplete, Judge Freeman ordered Respondent to supplement its production at a December 13, 2011 telephone conference.  (*See* Jan. 2013 Sun Decl. ¶¶ 5-6, Exs. B, C, D).  Respondent finally fulfilled its production obligations under the April 4 Order on March 20, 2012, four months after this Court overruled its objections.

Respondent produced approximately 1,300 pages of documents relating to accounts used by Laos's U.S. Embassy and Mission in support of their diplomatic functions.  (Resp.'s Rule 72(a) Objs. to Nov. 26, 2012 Order 2 [Dkt. No. 186] ("Resp.'s Nov. 26 Objs.")).  The documents consisted of bank records—including statements, check ledgers, and a list of processed checks—

for Embassy and Mission bank accounts held in the United States.  (*Id.*).  The records reflected that a substantial number of the payments made from the accounts were for commercial activities, such as payments to vendors, and several transactions of which "the nature and purpose of the transaction was not evident from the face of the bank records," such as payments to individuals who do not appear to be employees of the Mission or the Embassy.  (Pets.' Mem. in Opp. 4 [Dkt. No. 189] ("Pets.' Nov. 26 Mem.")).  The records also showed a variety of payments made in cash, and that "a majority of the cash balance" in the accounts "remains completely unused from month to month."  (*Id.*)

On August 10, 2012 Petitioners served Respondent with two deposition notices seeking testimony from a representative from both the Embassy and the Mission in order to "clarify[] these ambiguities in document production and to better understand the purpose and nature of certain of the payments reflected therein."  (*Id.* at 4; Jan. 2013 Sun Decl. Ex. J).  On August 30, 2012, Respondent sought a protective order from Judge Freeman to prevent the depositions from going forward.  (Jan. 2013 Sun Decl. Exs. K, L).   Respondent supplied a declaration from Thongmoon Phongphailath, First Secretary of the Lao People's Democratic Republic in the United States, which asserted that the Embassy and Mission bank accounts "have been used for a wide array of commercial transactions."  (Nov. 26 Order 6-7; *see also* Resp.'s Nov. 26 Objs. Ex. F).[11]  Mr. Phongphailath speculated that the attachment of these funds would render it "difficult, and perhaps impossible," for the Embassy and Mission to function.  (Nov. 26 Order 8 n.6).

After accepting additional briefing on this topic, Judge Freeman denied Respondent's request for a protective order on November 26, 2012 (the "November 26 Order").  [Dkt. No. 183].  Although Respondent contended that the FSIA and the Vienna Convention provided

---

[11] Mr. Phongphailath's declaration has been redacted, but the Court finds Judge Freeman's statement to be an accurate summary of its contents.

Respondent with immunity from discovery, Judge Freeman disagreed—citing *EM*—and held that neither the FSIA nor the Vienna Convention prohibited the discovery sought by Petitioners. (*Id.* at 5-6). Rather, Judge Freeman found that the cases cited by Respondent stood only for the proposition that the funds themselves could ultimately be immune from attachment, but did not provide immunity from discovery regarding those assets. (*Id.*) Second, Judge Freeman held that Petitioners had "shown at least some possibility that the funds in the Embassy and Mission accounts, or a portion of those funds, will be attachable." (*Id.* at 6). Judge Freeman rested this holding on the premise that "[t]he mere fact that assets are held in an account used by the state's embassy does not *per se* render the entire account immune from attachment or discovery." (*Id.* at 7 (citing *Thai Lao Lignite*, 2011 WL 4111504, at *4)). Given the uncertainty over whether the commercial transactions reflected in Respondent's records "were, in fact, ancillary to diplomatic purposes," Judge Freeman held that "Petitioners should be permitted to test Respondent's contentions by posing questions to a witness with knowledge." (Nov. 26 Order 8).

On December 12, Respondent wrote to Judge Freeman and requested a stay of the November 26 Order. (*See* Endorsed Letter from Anthony F. King to Judge Debra C. Freeman [Dkt. No. 187] ("Dec. 17 Order")). Judge Freeman denied Respondent's request for a stay by memo endorsement on December 17, noting that, after reviewing the submission, she was "not persuaded that a stay would be necessary or appropriate." (*Id.*). Respondent filed Rule 72(a) objections to the November 26 Order on December 10, [Dkt. No. 186], and to the December 17 Order on December 27. [Dkt. No. 192].

On January 10, 2013, Petitioners wrote to Judge Freeman and notified her that Respondent had not been willing to schedule the depositions as ordered. This Court held a conference to discuss the pending discovery issues on January 15, 2013, at which the Court

reminded Respondent that "simply objecting to a magistrate judge's discovery order does not stay that order," and ordered that the depositions go forward.  (Jan. 15, 2013 Hearing Trans., at 7:5-7:7, 8:16-8:19).  The Court also requested affidavits from Respondent and Respondent's counsel regarding the extent to which counsel had advised Respondent of its discovery obligations in order to determine how to allocate discovery sanctions for Respondent's continued recalcitrance.  The Court held a follow-up conference on January 31, 2013, and Petitioners' counsel informed the Court that the disputed depositions were scheduled to go forward on February 4 and 5.  (Jan. 31, 2013 Hearing Trans. at 7:4-7:11).

### B.  <u>Respondent's Objections to the November 26 Order</u>

Respondent objects to Judge Freeman's denial of its motion for a protective order to prevent depositions of Embassy and Mission personnel from going forward.  The Court finds no clear error in the November 26 Order and overrules Respondent's objections.

First, the Court rejects Respondent's argument that its diplomatic accounts are immune from discovery.  As noted above, the Second Circuit has explained that once a district court has jurisdiction over a foreign sovereign, it can "exercise its judicial power over [the foreign sovereign] as over any other party" without consideration of FSIA concerns.  *EM*, 695 F.3d at 210.  Whether a particular asset is immune under the FSIA matters if Petitioners ultimately seek to attach  that asset, but Petitioners "need not satisfy the stringent requirements for attachment in order to simply receive information about [Respondent's] assets."  *Id.* at 209.  Under this clear holding, Respondent's argument that its diplomatic accounts are immune from attachment under the FSIA is unavailing; Petitioners are entitled to discovery regarding those accounts regardless of whether or not they are ultimately attachable.

Respondent also argues that the Vienna Convention prohibits discovery regarding its diplomatic accounts.  Articles 22 and 25 of the Vienna Convention shield assets held in diplomatic bank accounts and used for diplomatic purposes from attachment.  *See* Vienna Conventions, art. 22, Apr. 19, 1961, 23 U.S.T. 3227 (holding diplomatic premises "inviolable" and immunizing them from "search, requisition, attachment, or execution"); *id.* art. 25 (according "full facilities for the performance of the functions of the mission"); *see also Sales v. Republic of Uganda*, No. 90 Civ. 3972, 1993 WL 437762, at *1 (S.D.N.Y. Oct. 23, 1993) (Haight, J.) ("[A] foreign state's bank account cannot be attached if the funds are used for diplomatic purposes."); *Avelar v. J. Cotoia Const., Inc.*, No. 11 Civ. 2172, 2011 WL 5245206, at *4 (E.D.N.Y. Nov. 2, 2011) ("Bank accounts used for diplomatic purposes are immune from execution under this provision, as facilities necessary for the mission to function.").

However, Judge Freeman correctly noted that there is no support for Respondent's contention that the Vienna Convention provides immunity from *discovery*.  (Nov. 26 Order 6). While diplomatic funds may ultimately be immune from *attachment*, Respondent has not provided—and the Court has not found—any support for the proposition that such accounts are immune from discovery.  Indeed, the concerns animating the Second Circuit's opinion in *EM* seem equally applicable in this context: once the Court has established jurisdiction over a foreign sovereign, the Court may order discovery as it would over any other defendant.  *EM*, 695 F.3d at 209-10.  In the Court's view, information about Respondent's Embassy and Mission accounts falls squarely under the "broad post-judgment discovery in aid of execution [that] is the norm in federal and New York state courts."  *Id.* at 207.

Judge Freeman further held that "Petitioners have shown at least some possibility that the funds in the Embassy and Mission accounts, or a portion of those funds, will be attachable."

(Nov. 26 Order 6).  Respondent argues that this conclusion is erroneous because the

Phongphailath Declaration establishes that the Mission and Embassy accounts are used

exclusively to support diplomatic functions.  (Resp.'s Nov. 26 Objs. 5).  However, the

Phongphailath declaration, and the bank records regarding the accounts, indicate that the

accounts have been used for a wide array of commercial transactions.  "[T]ransactions to

purchase goods or services from private entities" constitute "commercial activity" under the

FSIA regardless of what purpose the transactions ultimately serve.  *Liberian E. Timber Corp. v.*

*Gov't of the Republic of Liberia*, 659 F. Supp. 606, 610 (D.D.C. 1987).  Although the immunity

of funds in "mixed use" accounts (where some funds are directed towards diplomatic purposes

and others used for commercial transactions) is unclear, several decisions have found such funds

to be attachable.  *See, e.g.*, *Weston Compagnie de Finance et D'Investissement, S.A. v. La*

*Republica del Ecuador*, 823 F. Supp. 1106, 1114 (S.D.N.Y. 1993) (McKenna, J.) (finding that

the "mere placing of funds" not used for central banking into a foreign central bank's account

will not immunize such funds from attachment); *Birch Shipping Corp. v. Embassy of the United*

*Republic of Tanzania*, 507 F. Supp. 311, 313 (D.D.C. 1980) (holding funds in "mixed purpose"

account are not immune under the FSIA); *see also* Nov. 26 Order 7 (collecting cases).

The November 26 Order correctly found that the Mission and Embassy accounts may be

attachable even if some portion of those funds are used for diplomatic purposes.  The Court finds

no clear error in Judge Freeman's conclusion that Petitioners have made enough of a showing to

justify discovery into the accounts at issue, and agrees that "Petitioners should be permitted to

test Respondent's contentions by posing questions to a witness with knowledge."  (Nov. 26

Order 8).  As discussed at length above, "[w]hatever hurdles" Petitioners will face before

attaching Respondent's property, "it need not satisfy the stringent requirements for attachment in

order to simply receive information about [Respondent's] assets." *EM*, 695 F.3d at 209. Consequently, Respondent's objections to the November 26 Order are overruled.

### C. **Respondent's Objections to the December 17 Order**

Respondent also objects to the December 17 Order, in which Judge Freeman denied Respondent's application for a stay of the depositions pending this Court's resolution of its objections to her denial of their motion for a protective order. (Dec. 17 Order 1). Respondent's objections essentially repeat verbatim the arguments presented in its objections to the November 26 Order, but add discussion regarding the injury Respondent would suffer if the stay were denied, Petitioners' potential injury if a stay were granted, and the public interest. (Rule 72(a) Objs. of Resp. to the Dec. 17, 2012 Order [Dkt. No. 192] ("Resp.'s Dec. 17 Objs.") (citing *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002))). These factors govern a district court's decision to grant a stay pending appeal and are not applicable to an application for a discovery stay. A discovery stay may be entered upon the moving party's showing of "good cause" or "where resolution of a preliminary motion may dispose of an entire action." *Siemens Credit Corp.*, 2000 WL 534497, at *1.

The Court finds no clear error in Judge Freeman's decision not to issue a stay, and holds that Respondent's have not shown good cause for staying discovery. As discussed at length above, discovery has been ongoing for more than two years, a process which has been continually hampered by Respondent's constant objections to Judge Freeman's reasonable discovery orders. Respondent's continued focus on whether or not the property regarding which Petitioners seek discovery is ultimately attachable is misplaced; the Second Circuit has made clear that Respondent must comply with discovery obligations just like any other defendant in a post-judgment proceeding. Respondent's objections to the December 17 Order are overruled.

**IV.      CONCLUSION**

For the foregoing reasons, Magistrate Judge Freeman's May 29, July 20, July 31, August 1, November 26, and December 17 Orders are AFFIRMED.  The Court shall address Petitioners' pending motion for sanctions against Respondent at a hearing in Courtroom 18B on March 5, 2013 at 2:00 p.m.  Counsel for Petitioners is directed to submit a revised statement to the Court explaining what sanctions are appropriate and against whom such sanctions should be imposed by February 22, 2013.  Counsel for Respondents shall submit a response to Petitioners' revised statement by March 1, 2013.  Such statements shall not exceed fifteen double-spaced pages.

SO ORDERED.

Dated: New York, New York
       February __, 2013

_____
Kimba M. Wood
United States District Judge

32

IV.    **CONCLUSION**

For the foregoing reasons, Magistrate Judge Freeman's May 29, July 20, July 31, August 1, November 26, and December 17 Orders are AFFIRMED.  The Court shall address Petitioners' pending motion for sanctions against Respondent at a hearing in Courtroom 18B on March 5, 2013 at 2:00 p.m.  Counsel for Petitioners is directed to submit a revised statement to the Court explaining what sanctions are appropriate and against whom such sanctions should be imposed by February 22, 2013.  Counsel for Respondents shall submit a response to Petitioners' revised statement by March 1, 2013.  Such statements shall not exceed fifteen double-spaced pages.

SO ORDERED.

Dated: New York, New York
       February __, 2013

Kimba M. Wood
United States District Judge