UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THAI-LAO LIGNITE (THAILAND) CO., LTD. &
HONGSA LIGNITE (LAO PDR) CO., LTD,

Petitioners,

v.

GOVERNMENT OF THE LAO PEOPLE'S
DEMOCRATIC REPUBLIC,

Respondent.

Index No.  10 Civ. 5256 (KMW) (DF)

**PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ISSUANCE OF RESTRAINING NOTICES AND TO COMMENCE TURNOVER
<u>PROCEEDINGS</u>**

James E. Berger (JB 6605)
Charlene C. Sun (CS 1281)
King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: 212.556.2202
Email:  jberger@kslaw.com
                csun@kslaw.com

*Attorneys for Petitioners Thai-Lao
Lignite (Thailand) Co., Ltd. &
Hongsa Lignite (Lao PDR) Co., Ltd.*

## <u>TABLE OF CONTENTS</u>

Page

FACTS ............................................................................................................. 1

ARGUMENT ................................................................................................... 3

I.   The FSIA Does Not Preclude the Court's Restraint and Turnover of the Aviation
     Service Payments ...................................................................................... 4

     A.   Respondent's Repeated Failure to Assert FSIA Immunity With Respect to
          the Aviation Service Payments, Coupled With its Recent
          Acknowledgement That the Aviation Service Payments are Subject to
          Turnover in this Case, Constitutes an Irrevocable Waiver of any Immunity
          that Might Otherwise Apply ............................................................. 4

     B.   The Attachment and Execution Provisions of the FSIA are Inapplicable to
          the Aviation Service Payments ........................................................ 6

          1.   Section 1609 Immunity, and Section 1610's Limitations, Do Not
               Apply to *In Personam* Enforcement Proceedings ..................... 8

          2.   Section 1609 Immunity, and Section 1610's Limitations, Apply
               Only to "Attachment Arrest and Execution," None of Which Are
               Sought Hereby ............................................................... 11

          3.   Any FSIA Immunity is Subject to the New York Convention ............... 13

          4.   The Relief Sought by Petitioners Herein is *In Personam* in Nature ........ 15

     C. Assum        ing, *Arguendo*, the Execution Provisions of the FSIA Apply and
          that Respondent Has Not Waived its Protections, the Aviation Service
          Payments May Nonetheless Be Restrained and Ordered Turned Over to
          Petitioners ................................................................................. 17

          1.   The Aviation Service Payments Are "In the United States" .................... 17

          2.   The Aviation Service Payments are Used for a Commercial
               Purpose in the United States ............................................... 18

II.  The Remedies Sought Hereby are Available Under New York Law .............................. 19

     A.   The Airline Service Fees May be Restrained ...................................... 19

     B.   Petitioners May Commence Turnover Proceedings Against the Airlines for
          Purposes of Compelling Payment of the Aviation Service Payments to
          Petitioners in Aid of the Judgment .................................................. 21

CONCLUSION ................................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*ABKCO Indus. v. Apple Films,*
  39 N.Y.2d 670 (1976) ..................................................................................22

*Aequitas Ent. LLC v. Interstate Inv. Grp., LLC,*
  267 P.3d 923 (Utah Dec. 23, 2011) ...............................................................9

*Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.,*
  190 F.3d 16 (2d Cir. 1999)............................................................................22

*Augsbury Corp. v. Petrokey Corp.,*
  97 A.D.2d 173 (3d Dept 1983) ...............................................................17, 20

*Boise Cascade Corp. v. State,*
  278 N.W.2d 699 (Mich. App. 1979) ..............................................................18

*Doubet v. Trustees of Columbia Univ.,*
  32 Misc.3d 1209, 2011 WL 2636259 (Sup. Ct. Jul. 6, 2011) ..................15, 20

*Drexel Burnham Lambert Grp. v. Comm. of Receivers for A.W. Galadari,*
  12 F.3d 317 (2d Cir. 1993)..............................................................................6

*EM Ltd. v. Republic of Argentina,*
  695 F.3d 201 (2d Cir. 2012) ("*EM Ltd. II*")..............................................15, 16

*Genicom Corp. v. Ekco Group,*
  160 A.D.2d 551 (1st Dep't 1990) ............................................................18, 20

*Groza–Vance v. Vance,*
  162 Ohio App.3d 510, 834 N.E.2d 15 (2005)..................................................9

*Gryphon Dom. VI, LLC v. APP Int'l Fin. Co.,*
  41 A.D.3d 25, 836 N.Y.S.2d 4 (1st Dep't 2007) ...........................................15

*Hanson v. Denkla,*
  357 U.S. 235 ....................................................................................................8

*Harris v. Balk,*
  198 U.S. 215 (1905).......................................................................................17

*Hotel 71 Mezz Lender LLC v. Falor,*
  14 N.Y.3d 303, 900 N.Y.S.2d 698 (2010) ................................................9, 17

*In re Marriage of Kowalewski,*
  163 Wash.2d 542, 182 P.3d 959 (2008) (Wash. 2008).................................10

*International Ins. Co. v. Caja Nacional de Ahorro y Seguro*,
  No. 00 Civ. 6703, 2001 WL 322005 ................................................................14

*Johnson v. Johnson*,
  68 A.D.3d 1685, 891 N.Y.S.2d 848 (4th Dept. 2009) .................................9

*Koehler v. Bank of Bermuda*,
  12 N.Y.3d 533, 883 N.Y.S.2d 763 (2009) ...............................................9, 15, 20

*Muollo v. Crestwood Vil.*,
  155 A.D.2d 420 (2d Dep't 1989) ..........................................................18, 20

*O'Gilvie v. U.S.*,
  519 U.S. 79 (1996) ..................................................................................12

*Skandia America Reins. Corp. v. Caja Nacionale de Ahorro y Segoro*,
  No. 96 Civ. 2601 (KMW), 1997 WL 278054 (S.D.N.Y. May 23, 1997) .........13, 14

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..............................................................................12

*Sumitomo Shoji New York, Inc. v. Chemical Bank New York Trust Co.*,
  47 Misc.2d 741, 263 N.Y.S.2d 354 (N.Y. Sup. Ct. 1965) ..........................19

*U.S. v. Kozeny*,
  541 U.S. 166 (2d Cir. 2008) ...................................................................10

*Walters v. People's Rep. of China*,
  651 F.3d 280 (2d Cir. 2011) ...........................................................6, 10, 12

**STATUTES**

22 U.S.C. § 2459 ........................................................................................12, 13

28 U.S.C. 1611(a) ...........................................................................................11

28 U.S.C. §§ 1604, 1609 ...............................................................................13

28 U.S.C. §§ 1605(a)(1), 1610(a)(1) .................................................................6

28 U.S.C. § 1611(a) .........................................................................................11

N.Y. C.P.L.R. 5230 ...........................................................................................7

Sections 5225 and 5227 of the N.Y. C.P.L.R. ............................................9, 15

N.Y. C.P.L.R. 5201(b) .....................................................................................22

N.Y. C.P.L.R. 5222 ...................................................................................1, 15, 19

N.Y. C.P.L.R. 5225(b) ......................................................................................21

Illinois Insurance Law ......................................................................................14

Section 1213(c) of the New York Insurance Law ...................................................14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 69 ...........................................................................................15

Fed. R. Civ. P. 69(a) ........................................................................................18

Fed. R. Civ. P. 60(b) ..........................................................................................3

UNCITRAL Rules, Art. 32(2) ...........................................................................4, 14

Petitioners Thai-Lao Lignite (Thailand) Co., Ltd. ("TLL") and Hongsa Lignite (Lao PDR) Co., Ltd. ("HLL") (together, "Petitioners") hereby move this Court for (a) an order directing the commercial airlines listed in Appendix A (the "Airlines") to show cause why an order should not be issued pursuant to Sections 5225 and/or 5227 of the New York Civil Practice Law & Rules ("CPLR") directing them to pay to Petitioners the full amount of any property of Respondent that they hold in their possession and/or any debts they owe to Respondent, to Petitioners, in aid of the Judgment entered herein, and (b) authorizing service of restraining notices on the Airlines pursuant to Section 5222 of the CPLR.  Petitioners' application should be granted, for all the reasons that follow.

## FACTS

On August 3, 2011, this Court confirmed an arbitration award issued in favor of Petitioners and against Laos, and entered judgment thereon (the "Judgment").[1]  Dkt. 50.  That judgment was affirmed by the Court of Appeals on July 13, 2012.[2]  No part of the Judgment has been paid.

On August 17, 2011, Petitioners sought and obtained an order to show cause (the "Omnibus Enforcement Motion") that, *inter alia*, requested issuance of restraining notices to several U.S. airlines that Laos had stated in its discovery responses periodically paid fees to Laos in exchange for their right to use Lao airspace and air traffic control services.  Petitioners have voluntarily withdrawn the majority of the requests for relief in the Omnibus Enforcement Motion, including, *inter alia*, all requests pertaining to overflight fees.  Since the filing of the

---

[1] On April 23, 2012, the Court entered an amended judgment in the amount of "$57,210,000, plus interest at a rate of 9% from November 4, 2009 to the date of satisfaction."  Dkt. 87.

[2] Respondent petitioned the Court of Appeals for rehearing *en banc*.  That petition was denied on October 18, 2012.  On January 17, 2013, Respondent filed a petition for a writ of *certiorari* in the Supreme Court, which was denied on February 25, 2013.

1

Omnibus Enforcement Motion, however, Petitioners have obtained additional information,

primarily through third party discovery, that confirms with specificity that the Airlines regularly

pay Respondent fees (hereafter, "Aviation Service Payments") in connection with their flights

over Laos.  Specifically, on January 31, 2012, Petitioners served third-party subpoenas for the

production of documents ("January 31 Subpoenas") on, *inter alia*, United Airlines, Inc.

("United"), Kalitta Air, LLC ("Kalitta"), and Colt International Inc. ("Colt") – each of which

were disclosed by Laos in its March 2011 document production to have paid "overflight

payments" to Laos on a periodic basis[3] – seeking, *inter alia*, all documents evidencing or

concerning amounts paid or currently due and payable to Laos as a result of any "Aviation

Service Charge," defined as:

> any fee or amount charged by the Government of the Lao People's
> Democratic Republic in connection with civil aviation operations
> in or over the territory of the Lao People's Democratic Republic,
> including, without limitation:  overflight service charges; landing
> service charges; service charges relating to air navigational aid;
> service charges for certification of technical inspection; service
> charges for inspection of passengers, baggage and cargo; service
> charges for transport; service charges for transport of cargo;
> service charges for mail; service charges for ground handling
> services; and/or any other fees or service charges imposed by Laos
> in connection with civil aviation operations in or over the territory
> of the Lao People's Democratic Republic.

*See* Sun Decl. ¶ 17; Exhibit M.  On February 13, 2012, Petitioners also served a third-party

subpoena for the production of documents ("February 13 Subpoena") on FedEx Corporation

("FedEx") seeking the same documents as the January 31 Subpoenas.  *See* Sun Decl. ¶ 18; Ex. N.

The document productions from the subpoenaed entities confirm that the obligation to

pay Aviation Service Payments arises every time one of the Airlines flies over or into Laos, and

---

[3] *See* Declaration of Charlene C. Sun, dated March 4, 2013 ("Sun Decl.") ¶ 12; Ex. H.

that those obligations are invoiced by Respondent's Lao Air Traffic Management on a monthly basis.[4]  *See* Sun Decl. ¶¶ 20-22; Exs. P, Q, R.  Based on this information, Petitioners respectfully submit it to be indisputable that the Aviation Service Payments are subject to restraint and turnover under New York law in satisfaction of the Judgment, and further that the Foreign Sovereign Immunities Act imposes no obstacle to the restraint and turnover of the Aviation Service Payments sought hereby.

## ARGUMENT

The Aviation Service Payments are subject to this Court's enforcement jurisdiction. Respondent has never claimed that the Aviation Service Payments are protected from enforcement by the Foreign Sovereign Immunities Act ("FSIA"), despite having had several opportunities to do so.  Indeed, Respondent expressly conceded during a recent hearing before this Court that the Aviation Service Payments were "commercial assets in the United States" that "could be used to satisfy" the Judgment.  Respondent made the same admission to the Court of Appeals that the Aviation Service Payments are "available" to "further the purpose" of enforcing this Court's judgment, in its Opposition to Petitioners' Motion for Limited Remand filed in the Court of Appeals on April 2, 2012.  Specifically, Respondent argued that Petitioners' then-pending Rule 60(b) motion to correct the Judgment should be denied because the errors in the judgment sought to be corrected through that motion "ha[ve] not negatively impacted" Petitioners because the Judgment was effectively uncollectible in the United States.  It further stated that:

---

[4] Kalitta interposed objections to the subpoena on various grounds, and has not yet produced any documents in response to the subpoena.  *See* Sun Decl. ¶ 23.  Nonetheless, Petitioners seek to direct a restraining notice toward Kalitta because it has not denied that it owes any Aviation Service Payment to Laos, a fact which was demonstrated by Laos' March 2011 document production.

> Enforcing the award is the sole purpose of this case, and the
> discovery record shows that, except for some U.S.-based airlines
> payments for overflight fees to Laos, there are no assets in the
> United States available to further that purpose.

*See* Sun Decl. ¶ 15; Ex. K, at 2 (emphasis supplied).  Those statements, particularly when

juxtaposed with Respondent's consistent, sweeping denials that there are any assets against

which this Court's Judgment may be enforced, *see* Sun Decl. ¶ 3; Ex. B, must be regarded as a

waiver by Respondent of any right to contest turnover of the Aviation Service Fees under the

FSIA.  Even if, however, the Court were to find that Respondent's repeated refusal to claim

immunity over the Aviation Service Payments does not constitute a waiver – and Petitioners

respectfully submit that such a finding would reward gamesmanship of the worst kind – the

Court should find that those payments are subject to enforcement under FSIA.

I.    **The FSIA Does Not Preclude the Court's Restraint and Turnover of the Aviation Service Payments**

A.    **Respondent's Repeated Failure to Assert FSIA Immunity With Respect to the Aviation Service Payments, Coupled With its Recent Acknowledgement That the Aviation Service Payments are Subject to Turnover in this Case, Constitutes an Irrevocable Waiver of any Immunity that Might Otherwise Apply**

Notwithstanding its express and unequivocal waiver of any immunity in connection with

this proceeding, *see* Sun Decl. ¶ 3; Ex. B, and further notwithstanding its express contractual

covenant to pay the arbitral award underlying the Judgment,[5] Respondent's posture before this

Court has consisted primarily of its persistent efforts to avoid this Court's jurisdiction and

Judgment through sweeping, if often meritless, claims of sovereign immunity.  Respondent has

---

[5] *See* UNCITRAL Arbitration Rules, Art. 32(2) (1976) ("The award shall be made in writing and shall be final and binding on the parties. The parties undertake to carry out the award without delay.").

gone so far to claim that it has no obligation to pay this Court's Judgment, and it has consistently argued that the FSIA excuses its obligation to comply with discovery concerning any category of assets that Petitioners have not first demonstrated is subject to attachment and execution under Section 1610 of the FSIA.  Essentially, Respondent has argued repeatedly that discoverability is tantamount to a pre-proven lack of FSIA immunity, and as the Court is aware, it has refused to comply with the overwhelming majority of Petitioners' discovery requests on that ground.

Despite the breadth of its invocations of immunity, Respondent has consistently treated the Aviation Service Payments differently, and it has done so in a manner that makes clear it is not claiming that those payments are immune from the Court's enforcement jurisdiction.  Most notably, Respondent voluntarily disclosed the Aviation Service Payments to Petitioners approximately two years ago, and has never invoked the FSIA as an obstacle to their susceptibility to judicial process to enforce the judgment (including, *inter alia*, in response to Petitioners' Omnibus Enforcement Motion, which specifically sought restraint of a subset of the Aviation Service Payments).  Respondent, in a formal submission to the Court of Appeals, admitted that they are available to satisfy the Judgment, *see* Sun Decl. ¶ 15; Ex. K, and most recently, during a hearing before this Court convened on January 31, 2013, Respondent's counsel again admitted that the Aviation Service Payments were "commercial assets in the United States" that "could be used to satisfy the judgment," *see* Sun Decl. ¶ 16; Ex. L, at 10-11.  These admissions, coupled with Respondent's repeated failure to claim that the Aviation Service Payments are subject to the protections of the FSIA and its clear and consistent differentiation of

those payments from the other assets potentially at issue in this proceeding,[6] mandates a finding

that Respondent has intentionally and unambiguously waived any argument that the Aviation

Service Payments are immune from the Court's enforcement jurisdiction.  *E.g., Drexel Burnham*

*Lambert Grp. v. Comm. of Receivers for A.W. Galadari*, 12 F.3d 317, 327 (2d Cir. 1993)

(holding, based on the FSIA's legislative history, that an implicit waiver of FSIA immunity

occurs where a foreign state files a responsive pleading without raising the defense of sovereign

immunity); *see also Walters v. People's Rep. of China*, 651 F.3d 280, 295 (2d Cir. 2011)

(implicit waiver may be found through certain steps taken in litigation where those steps

evidence intentional relinquishment of known right); 28 U.S.C. §§ 1605(a)(1), 1610(a)(1).  This

Court should therefore find that Respondent's persistent differentiation of the Aviation Service

Payments from the other assets as to which discovery has been sought, together with its

admission to this Court and the Court of Appeals that those payments are subject to the Court's

jurisdiction, constitute a waiver by Respondent of any protection that the FSIA might otherwise

afford the Aviation Service Payments, and hold that the FSIA does not preclude the Court's

exercise of its enforcement jurisdiction over them.

**B.     The Attachment and Execution Provisions of the FSIA are Inapplicable to the Aviation Service Payments**

Section 1609 of the FSIA provides that "[s]ubject to existing international agreements to

which the United States is a party at the time of enactment of this Act the property in the United

States of a foreign state shall be immune from attachment, arrest and execution except as

provided in sections 1610 and 1611 of this chapter."  (Emphasis supplied.)   Sections 1610 and

---

[6] A comprehensive accounting of Respondent's statements and admissions concerning the Aviation Service Payments is set forth in paragraphs 7 through 16 of the accompanying Sun Declaration.

1611 then set forth the exceptions from this general grant of immunity, and establish specific rules that govern attachment and execution proceedings against foreign states, respectively.

Petitioners respectfully submit that neither Section 1609's conferral of immunity, nor Section 1610's exceptions to immunity, apply to this motion, which seeks *in personam* relief that is neither "attachment, arrest, or execution"[7] and which does not seek any exercise of jurisdiction over property. This is a critical distinction, the significance of which has been the subject of recent Second Circuit and New York caselaw, and that when the language of the FSIA's attachment and execution provisions is examined carefully, those provisions should not, and do not, apply to *in personam* enforcement proceedings such as the "turnover" remedy that Petitioners seek here. To the contrary, the use of such remedies to enforce a judgment against a foreign state must be measured against the jurisdictional provisions of the FSIA, which collectively govern a U.S. court's right to exercise *in personam* jurisdiction against a foreign state, and not the execution provisions, which by their plain terms confer immunity upon "property" and thus must be seen as applying only to actions against property, *i.e.*, actions *in rem* such as executions and attachments. While Petitioners are not aware of any published decisions specifically addressing this distinction or the proper applicability of the execution provisions of the FSIA to *in personam* turnover proceedings – each of the decisions of which Petitioners are aware have consistently assumed, without considering or deciding, that Sections 1609-1611 apply to all post-judgment enforcement proceedings – Petitioners respectfully submit that when

---

[7] *See* N.Y. C.P.L.R. 5230 (describing execution, which authorizes a sheriff to seize property found within the relevant jurisdiction and to use such property to satisfy the judgment) & Art. 62 (attachment). Petitioners respectfully submit that "arrest," a discrete concept generally reserved for use in maritime proceedings, is not at issue here. As noted above, Petitioners have withdrawn their pending request for issuance of a writ of execution.

the text of those sections is examined under black-letter rules of statutory construction, the conclusion that they apply exclusively to the specific *in rem* proceedings listed in them is inescapable.

Petitioners further submit that because this case was commenced under the New York Convention – an international agreement that was in force in the United States at the time the FSIA was adopted – any applicable immunities in this case must yield to the New York Convention's express and animating purpose of facilitating the prompt enforcement of international arbitration awards.

1.    **Section 1609 Immunity, and Section 1610's Limitations, Do Not Apply to *In Personam* Enforcement Proceedings**

Whereas Section 1604 of the FSIA confers immunity on foreign states themselves, Section 1609 provides that "the property of a foreign state in the United States shall be immune from attachment arrest and execution."  There are, for present purposes, three notable aspects of this language that, particularly when viewed together, demonstrate that the immunity set forth in Section 1609 applies only to property and in proceedings *in rem*.

First, the specific wording of this grant of immunity – and particularly the extent to which it differs from the jurisdictional immunity conferred by Section 1604 – is significant.  Section 1604 confers immunity upon the state directly.  Section 1609, however, confers immunity solely upon property.  This is not an idle distinction; courts have repeatedly stressed that there is a critical jurisdictional difference between actions that lie directly against property (actions *in rem*) and those that are based on jurisdiction over the person (actions *in personam*).  *See, e.g., Hanson v. Denkla*, 357 U.S. 235, 246-52 & n.12 (noting that *in rem* jurisdiction is "founded on physical power" and based on the presence of property within the territorial jurisdiction of the court,

8

while noting that courts have the ability to exercise power over non-residents, subject to due process considerations).

Federal and state courts have repeatedly recognized this distinction in the enforcement context, and taken note of the fundamental difference between *in rem* and *in personam* enforcement devices.  Most notably for present purposes, the New York Court of Appeals, in *Koehler v. Bank of Bermuda*, 12 N.Y.3d 533, 537, 883 N.Y.S.2d 763, 766 (2009), distinguished between attachment, which it held "is typically based on jurisdiction over property," and the "turnover" proceeding provided for in Sections 5225 and 5227 of the C.P.L.R., which it found is based on jurisdiction over the person.  The Court of Appeals also observed that writs of execution, in contrast, operate solely against property, by noting that a sheriff may not levy on property located outside the state.  Based upon these distinctions, the Court of Appeals ruled as a matter of New York law that while a court may not attach or execute on property outside its territorial jurisdiction, it may order a non-domiciliary over whom it has personal jurisdiction to deliver property to a judgment creditor in aid of a judgment, since such an order necessarily does not involve any exercise of jurisdiction over the property itself.  *Koehler*, 12 N.Y.3d at 537; *see also Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 310, 900 N.Y.S.2d 698, 702-03 (2010) ("the provisional remedy of attachment…operates only against the property of the defendant, not on his/her person").[8]

---

[8] Other state court decisions are in accord.  *See, e.g., Aequitas Ent. LLC v. Interstate Inv. Grp., LLC,* 267 P.3d 923, 926 (Utah Dec. 23, 2011) (noting "critical distinction" between *in rem* and *in personam* jurisdiction in connection with question of whether state court could attach interests in property located outside Utah, and noting that where court's authority is predicated on *in personam* jurisdiction, court has jurisdiction to adjudicate parties' interest in real property, even where that real property is located outside the state) (citing *Hanson*, 357 U.S. at  246 n.12 (1958)); *Johnson v. Johnson*, 68 A.D.3d 1685, 891 N.Y.S.2d 848, 850 (4th Dept. 2009) ("While

(continued...)

Given the recognized distinction between actions against persons and actions against property, Congress' unambiguous conferral of immunity only upon property must be accorded significance by limiting that immunity (and the corresponding exceptions set forth in Section 1610) to its plainly stated terms; to interpret Section 1609 as conferring an immunity that applies both to proceedings against property and persons would violate well-settled principles of statutory construction by ignoring the plain text used by Congress, conflating discrete legal concepts, and expanding the FSIA's grant of immunity well beyond that reflected by the statute's plain terms. *See, e.g., U.S. v. Kozeny,* 541 U.S. 166, 171 (2d Cir. 2008) ("Where the statute's language is plain, it is the sole function of courts to enforce it according to its terms") (internal quotations omitted) (citing *U.S. v. Ron Pair Enter. Inc.*, 489 U.S. 235, 241 (1989)); *see also Walters v. People's Rep. of China*, 651 F.3d 280, 294 (2d Cir. 2011) (discussing with approval the principle of *expressio unius est exclusio alterius*, which provides that "the mention of one thing necessarily implies the exclusion of the other") (citing *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 221 (2d Cir. 2009)).  In sum, the plain language of Sections 1609 and 1610 is clear, and evinces an intention on the part of Congress to apply execution immunity only to the

---

(...continued)

a divorce court in one state has no in rem jurisdiction over out-of-state real property and thus does not have the power directly to affect, by means of its decree, the title to real property situated in another state, a court with personal jurisdiction over the parties has equity jurisdiction over their rights with respect to foreign realty." (citations omitted) (internal quotation marks omitted)); *Groza–Vance v. Vance*, 162 Ohio App.3d 510, 834 N.E.2d 15, 24 (2005) (distinguishing between "a judicial conveyance of title, which directly affects title to property, and a court order against the persons over whom it has personal jurisdiction, which indirectly affects title to property and nothing that [w]ith respect to out-of-state property over which the court has no in rem jurisdiction, the former is impermissible while the latter is not."); *In re Marriage of Kowalewski*, 163 Wash.2d 542, 182 P.3d 959, 962–63 (2008) (Wash. 2008) ("[A] court may indirectly affect title by means of an in personam decree operating on the person over whom it has jurisdiction.... We have long recognized the distinction between jurisdiction to adjudicate title to land and jurisdiction to settle the parties' personal interests in real estate.").

"property of a foreign state."  By necessary extension, that immunity may only apply in actions brought against such property, rather than to *in personam* actions brought against persons in possession of it.

> **2.  Section 1609 Immunity, and Section 1610's Limitations, Apply Only to "Attachment Arrest and Execution," None of Which Are Sought Hereby**

Second, Section 1609 immunity applies only to three specified remedies – attachment, arrest, and execution – all of which lie against property and involve the exercise of *in rem* jurisdiction.  And while federal courts appear to have routinely assumed that Sections 1609 and 1610 apply to any post-judgment enforcement proceeding, a comparison of those provisions to closely-related immunity provisions shows that Congress's decision to apply Section 1609 and 1610 to three discrete enforcement remedies was deliberate, and not intended to apply indiscriminately to all judicial enforcement measures.  The first of these provisions, which is included in the FSIA and governs enforcement proceedings involving international organizations, provides:

> (a)  Notwithstanding the provisions of Section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.[9]

28 U.S.C. 1611(a) (emphasis supplied).

---

[9] 28 U.S.C. § 1611(a) (emphasis supplied).

Section 1611 is worded much differently than Section 1609, and the difference must be both considered intentional and afforded significance.  Whereas the property of a foreign state is immune from "attachment arrest and execution," the property of international organizations is immune from attachment or any other judicial process impeding the disbursement of funds" (emphasis supplied).  This language necessarily reflects Congress' understanding that the specific proceedings identified in Section 1609 do not constitute the full panoply of enforcement remedies available to a Court, and that the international organizations were intended to enjoy immunity from any type of enforcement remedy that could, whether on an *in rem* or *in personam* basis, freeze or divert certain assets.  Petitioners respectfully submit that the absence of this language in Section 1609, without more, necessarily establishes that the FSIA was not intended to, and by its plain terms cannot by applied to, proceedings other than "attachment arrest or execution."  *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 709 n. 9 (2004) (noting the rule that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended) (citing 2A N. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46.06 p. 194 (6th rev. ed. 2000)); *O'Gilvie v. U.S.*, 519 U.S. 79, 97 (1996) (noting applicability of this canon where "the contrasting provisions appear in adjoining provisions that address precisely the same subject matter and that even have identical grammatical structure) (citations omitted); *Walters*, 651 F.3d at 294 (discussing with approval the principle of *expressio unius est exclusio alterius*, which provides that "the mention of one thing necessarily implies the exclusion of the other").

Second, 22 U.S.C. § 2459, which protects certain artistic and cultural items from judicial process, provides that where such items are imported into the United States pursuant to an agreement between the foreign owner of the items and a cultural or education institution in the

United States,

> no court of the United States, any State, the District of Columbia,
> or any territory or possession of the United States may issue or
> enforce any judicial process, or enter any judgment, decree, or
> order, for the purpose or having the effect of depriving such
> institution, or any carrier engaged in transporting such work or
> object within the United States, of custody or control of such
> object if before the importation of such object the President or his
> designee has determined that such object is of cultural significance
> and that the temporary exhibition or display thereof within the
> United States is in the national interest, and a notice to that effect
> has been published in the Federal Register.

22 U.S.C. § 2459 (emphasis supplied).  Like Section 1611(a), Section 2459 extends its grant of

immunity to "any judgment, decree, or order," rather than listing specific and discrete remedies

to which it applies.

When juxtaposed with Section 1609, each of these statutory provisions demonstrates that

if Congress had wished to vest foreign states with immunity from any judicial process through

which a judgment could be enforced, it could easily have done so.  It did not, however, and

particularly where Section 1611(a) and Section 2459 confer a much broader immunity from "any

judicial process," Petitioners respectfully submit that the immunity afforded by Section 1609

(and the companion exceptions afforded by Section 1610) must, under well-established rules of

statutory interpretation, be held to apply exclusively to proceedings seeking "attachment, arrest,

or execution" against "the property of a foreign state," and not from "any other judicial process"

that a Court might find analogous.

### 3.    Any FSIA Immunity is Subject to the New York Convention

Third, the fact that this case arises under the New York Convention means that the

FSIA's immunities are subordinate to that international agreement.  As the Court is surely aware,

the FSIA's jurisdictional and execution-related immunities are expressly made "[s]ubject to existing agreements" to which the United States was a party at the time the FSIA was enacted. *See* 28 U.S.C. §§ 1604, 1609.  This Court, in *Skandia America Reins. Corp. v. Caja Nacionale de Ahorro y Segoro*, No. 96 Civ. 2601 (KMW), 1997 WL 278054 (S.D.N.Y. May 23, 1997), held that the New York Convention – the treaty under which this case has been brought and an international agreement in effect at the time the FSIA was adopted, and thus an agreement to which the FSIA's immunities are expressly subject – permitted the Court to require a foreign state defendant to post, as a condition for contesting the plaintiff's petition to confirm an arbitration award, security pursuant to Section 1213(c) of the New York Insurance Law, despite the lack of any basis under the FSIA to enter a pre-judgment attachment.[10]  In *Skandia*, this Court noted the Second Circuit's command that courts afford the New York Convention a "broad construction" and that a purpose of the Convention "was to encourage the enforcement of arbitral awards."  *Skandia*, 1997 WL 278054 at *4-5.  Specifically, the Court found that Article IV of the New York Convention permitted the Court to require a pre-judgment attachment even though the sovereign defendant had not waived its immunity from such measures and the FSIA did not otherwise permit it.  *Id.* at *5.

Similarly here, the New York Convention provides, in Article III, that contracting states shall "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  The Convention further requires, in

---

[10] *See also International Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00 Civ. 6703, 2001 WL 322005, at **1-2 (N.D. Ill. Apr 02, 2001) (holding that FSIA did not bar the imposition of prejudgment security on instrumentality of Argentina, on the basis that New York Convention was an "existing international agreement" at the time the FSIA was enacted, and that by challenging petition to confirm arbitral award, the defendant was not immune from the posting requirement of the Illinois Insurance Law).

Article II, this Court to recognize any arbitration agreement made in writing.  Here, the written

arbitration agreement specifically provides that any award shall be binding and conclusive, and,

by incorporating the UNCITRAL Rules, requires the parties to "carry out the Award without

delay."  UNCITRAL Arbitration Rules, art. 32(2).  These provisions, together with Article IV,

impose a strict obligation on Respondent to satisfy the award, just as they impose an obligation

on this Court to enforce the award if Respondent will not satisfy it voluntarily.  The Court,

confronted with Respondent's persisting refusal to do so, should find that Section 5225(a) of the

CPLR (applicable through Fed. R. Civ. P. 69) is a "rule of procedure of the territory where the

award is relied upon," and find that the New York Convention permits the use of the remedy

provided by that provision to compel enforcement of the PDA's arbitration agreement, the

award, and this Court's resulting judgment.

### 4.        The Relief Sought by Petitioners Herein is *In Personam* in Nature

New York courts have held that the remedies Petitioners are invoking here – the restraint

of property pursuant to Section 5222 of the CPLR and the "turnover" order authorized by

Sections 5225 and 5227 of the CPLR – each operate on an *in personam* basis.  *Koehler*, 12

N.Y.3d at 537 (turnover proceeding is *in personam* in nature); *Doubet v. Trustees of Columbia

Univ.*, 32 Misc.3d 1209, 2011 WL 2636259, *13 (Sup. Ct. Jul. 6, 2011) (holding that service of

restraining notice over party subject to court's personal jurisdiction applies to all property in that

party's possession, regardless of whether it is in New York); *see also Gryphon Dom. VI, LLC v.

APP Int'l Fin. Co.*, 41 A.D.3d 25, 38, 836 N.Y.S.2d 4, 14 (1st Dep't 2007) (reversing trial

court's vacatur of injunction against transfers of funds occurring outside United States and

noting that court had the authority to enjoin such transfers because it had jurisdiction over the

defendants).  For the reasons set forth above, neither of these claims for relief is subject to

Section 1609's grant of immunity or Section 1610's restrictions on those particular remedies as applied to "property of a foreign state used for a commercial activity in the United States."

Furthermore, the Second Circuit has recently recognized this distinction in *EM Ltd. v. Republic of Argentina,* 695 F.3d 201 (2d Cir. 2012) ("*EM Ltd. II*").  In that case, judgment-creditor NML Capital ("NML") has sought to compel a third-party bank's compliance with NML's subpoena seeking information concerning assets belonging to the judgment-debtor Argentina, who had, like Laos here, waived its sovereign immunity and was indisputably subject to the district court's jurisdiction.  Argentina objected that the discovery sought by NML infringed upon its sovereign immunity from attachment and execution, particularly to the extent that it sought information concerning Argentina's assets located outside of the United States, which Argentina asserted were absolutely immune from attachment.  The Court of Appeals rejected Argentina's argument, noting first that the "question of whether the FSIA extends immunity to property held outside the United States" remains unanswered in this Circuit, and holding that a district court's power to order discovery to enforce its judgment does not derive from its ultimate ability to attach the property in question, but rather from "its power to conduct supplementary proceedings, involving persons indisputably within its jurisdiction, to enforce valid judgments." *Id.* at 208 (emphasis supplied).  Citing *First City, Texas–Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 177 (2d Cir. 1998), the Court of Appeals explained that "[o]nce the district court had subject matter and personal jurisdiction over Argentina, it could exercise its judicial power over Argentina as over any other party." *Id.* at 209 (emphasis supplied).  Thus, the *EM Ltd.* Court's ruling holds that a foreign state party who has waived sovereign immunity is subject to the full sweep of the Court's *in personam* jurisdiction, and that it lacks the ability to

invoke sovereign immunity to thwart the proper invocation of *in personam* remedies designed to facilitate the satisfaction of a U.S. court's judgment.

In sum, the FSIA's protections do not apply to this motion for restraint and turnover. Respondent has clearly differentiated the Aviation Service Payments from its other assets and receivables; that differentiation, viewed in the context of Respondent's other litigation positions, clearly constitutes a waiver of any immunity. Even if the Court finds that Respondent has not waived the FSIA's protections with respect to the Aviation Service Payments, a proper reading of the FSIA leads to the conclusion that because Petitioners are invoking the Court's *in personam* jurisdiction, the attachment and execution immunities set forth in the FSIA do not apply; the only provisions of the FSIA that could apply are the jurisdictional provisions, as to which Respondent has expressly waived its immunity. And finally, the Court should hold that the turnover remedy is a procedural device, the use of which is necessary in this case to enforce the arbitral award, and is thus expressly permitted by the New York Convention. The FSIA simply does not prevent this Court from restraining the Aviation Service Payments or ordering the Airlines to turn those payments over to Petitioners as they come due.

C.   **Assuming, *Arguendo*, the Execution Provisions of the FSIA Apply and that Respondent Has Not Waived its Protections, the Aviation Service Payments May Nonetheless Be Restrained and Ordered Turned Over to Petitioners**

1.   The Aviation Service Payments Are "In the United States"

The Aviation Service Payments are debts, and under New York law, the situs of a debt is wherever the debtor is found. Where the debtor is found and subject to personal jurisdiction in New York, a proceeding may be commenced against it in New York to compel turnover of the debt to a judgment creditor. *See Hotel Mezz 71*, 14 N.Y.3d at 314-15, 926 N.E.2d 1201 (holding that the power to enforce or collect a debt is dependent on the presence of the debtor in the state,

not the domicile of the debtor); *see also Harris v. Balk*, 198 U.S. 215, 222-23 (1905) ("The

obligation of the debtor to pay his debt clings to and accompanies him wherever he goes.").  It is

indisputable that each of the Airlines maintains a place of business in the United States.  *See* Sun

Decl. ¶¶ 24-28; Exs. S, T, U, V.  Furthermore, by obtaining authorization do to business in New

York, each of the Airlines consented to *in personam* jurisdiction in New York.  *Augsbury Corp.*

*v. Petrokey Corp.*, 97 A.D.2d 173, 175 (3d Dept 1983) (authorization to do business in the State

and concomitant designation of the Secretary of State as its agent for service of process is

consent to *in personam* jurisdiction); *Genicom Corp. v. Ekco Group*, 160 A.D.2d 551 (1st Dep't

1990); *Muollo v. Crestwood Vil.*, 155 A.D.2d 420 (2d Dep't 1989).  Therefore, because each of

the Airlines is located in the United States and subject to personal jurisdiction in New York, the

situs of the Aviation Service Payments each owes to Respondent must also be considered to be

"in the United States," and because the Airlines are subject to personal jurisdiction in New York,

this court may entertain an turnover proceeding against each of them.

### 2.  The Aviation Service Payments are Used for a Commercial Purpose in the United States

Neither the Supreme Court nor the Second Circuit has specifically construed Section

1610's requirement that property of a foreign state be "used for a commercial purpose in the

United States."  Given that the property at issue on this motion is intangible in nature, and further

given that New York law dictates that intangible property in the form of a debt be considered

located where the debtor is located, this Court should find that the intangible property is "used"

in the same location where it is deemed to be located.  Petitioners submit that analogous

principles of state tax law holding that a receivable owed by a foreign domiciliary may not be

considered as "in the state" (and thus taxed) simply on the ground that the revenue resulting from

that receivable is ultimately used in the taxing state bolster this conclusion.  *See, e.g., Boise*

*Cascade Corp. v. State*, 278 N.W.2d 699, 700 (Mich. App. 1979).

## II.     The Remedies Sought Hereby are Available Under New York Law

Fed. R. Civ. P. 69(a) provides that federal judgments are to be enforced in accordance with the enforcement law and procedures of the forum state.  Here, New York law expressly permits the Court to issue restraining notices to the Airlines, and also to order the Airlines to turn over to Petitioners all funds that the Airlines respectively owe to Respondent.

### A.     The Airline Service Fees May be Restrained

Restraining notices apply to prevent a recipient from making a payment to a judgment debtor.  *See Sumitomo Shoji New York, Inc. v. Chemical Bank New York Trust Co.*, 47 Misc.2d 741, 263 N.Y.S.2d 354, 358 (N.Y. Sup. Ct. 1965) (explaining the function and purpose of CPLR 5222).  Section 5222 of the CPLR provides,[11] in pertinent part:

> (a) Issuance; on whom served; form; service. A restraining notice may be issued by the clerk of the court or the attorney for the judgment creditor as officer of the court, or by the support collection unit designated by the appropriate social services district. It may be served upon any person, except the employer of a judgment debtor or obligor where the property sought to be restrained consists of wages or salary due or to become due to the judgment debtor or obligor . . .
>
> *             *             *
>
> (b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the

---

[11] Petitioners note that restraining notices pursuant to CPLR 5222 may be issued by the attorney for the judgment creditor; however, Petitioners believe it is more appropriate in this instance to act with the Court's knowledge, and therefore have brought this motion in order to obtain the Court's leave prior to serving restraining notices on the Airlines.

judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. . . .

This Court's issuance of the restraining notices annexed hereto as Appendix B would be a proper exercise of its *in personam* jurisdiction over each of the Airlines.  *See Doubet,* 2011 WL 2636259, at *13 (Sup. Ct. N.Y. Co. July 6, 2011).  It is indisputable that each of the Airlines is subject to personal jurisdiction in New York, as each is registered to do business in New York.[12] *See* Sun Decl. ¶¶ 24-28; Exs. S, T, U, V.  By obtaining authorization do to business in New York, each of the Airlines consented to *in personam* jurisdiction in New York.  *Augsbury Corp. v. Petrokey Corp.*, 97 A.D.2d 173, 175 (3d Dep't 1983) (authorization to do business in the State

---

[12] Furthermore, "CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires a garnishee to transfer money or property into New York from another state or country."  *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 539 (2009).

and concomitant designation of the Secretary of State as its agent for service of process is

consent to *in personam* jurisdiction); *Genicom Corp. v. Ekco Group*, 160 A.D.2d 551 (1st Dep't

1990); *Muollo v. Crestwood Vil.*, 155 A.D.2d 420 (2d Dep't 1989).

    To the extent any of the Airlines owes an Aviation Service Payment to Respondent at the

time the Restraining Notices are served, the Restraining Notice will operate to prohibit the

Airlines from making any Aviation Service Payments to Respondent until the Judgment is

satisfied.

**B.    Petitioners May Commence Turnover Proceedings Against the Airlines for Purposes of Compelling Payment of the Aviation Service Payments to Petitioners in Aid of the Judgment**

CPLR § 5225(b) provides, in pertinent part:

> (b) Property not in the possession of judgment debtor. Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff. . . .

Section 5227 provides:

> Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. . . .

A judgment creditor seeking a turnover order pursuant to Sections 5225(b) and 5227 must show:  "First, that the asset it seeks to collect has been made available to judgment creditors by § 5201; and second, that the party against which the creditor has chosen to proceed has the ability to produce the asset."  *Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 29 (2d Cir. 1999).  Both of these conditions are satisfied here.

First, as discussed above, the Aviation Service Payments sought by Petitioners for turnover are subject to enforcement pursuant to CPLR 5201.  *See ABKCO Indus. v. Apple Films*, 39 N.Y.2d 670, 674-75 (1976) (holding that a debt, whether currently due or not, may be considered as "property" under CPLR 5201(b), and is therefore leviable under Article 52).  Second, based on the information Petitioners obtained from the Airlines through third party discovery, Petitioners believe that each of the Airlines currently owes Aviation Service Payments to Laos which may be turned over in partial satisfaction of the Judgment herein.

## CONCLUSION

For all of the foregoing reasons, Petitioners respectfully request that this Court issue the order to show cause submitted herewith, together with the restraining notices annexed hereto as Appendix B in order to restrain and commence proceedings to compel the turnover of the Aviation Service Payments owed to Laos by the Airlines.  To the extent that this Court finds that any of the Aviation Service Payments have not been identified with sufficient specificity, Petitioners respectfully request that any resulting denial of Petitioners' motion be made without prejudice in order to permit Petitioners to take discovery on the issue.

Dated:  New York, New York
        March 4, 2013

James E. Berger (JB 6605)
Charlene C. Sun (CS 1281)
King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: 212.556.2202
Email:  jberger@kslaw.com
        csun@kslaw.com

*Attorneys for Petitioners Thai-Lao Lignite
(Thailand) Co., Ltd. & Hongsa Lignite (Lao
PDR) Co., Ltd.*