UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
|
THAI LAO LIGNITE (THAILAND) CO., LTD. & |
HONGSA LIGNITE (LAO PDR) CO., LTD., |
|
              Petitioners, |   10 Civ. 5256 (KMW) (DCF)
   -against- |
|   OPINION and ORDER
GOVERNMENT OF THE LAO PEOPLE'S |
DEMOCRATIC REPUBLIC, |
|
              Respondent. |
|
---------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

On August 5, 2011, this Court entered a judgment against the Government of the Lao People's Democratic Republic ("Respondent") enforcing a $56 million arbitral award in favor of Thai-Lao Lignite (Thailand) Co., Ltd. and Hongsa Lignite (Lao PDR) Co., Ltd. (collectively, "Petitioners"). [Dkt. No. 50]. Since that time, the parties have been engaged in protracted post-judgment discovery regarding assets potentially available to satisfy the award.[1] On March 4, 2013, Petitioners moved ex parte for restraining notices and turnover of fees against four airlines—Federal Express Corporation, Colt International, Inc., Kalitta Air, LLC, and United Air Lines, Inc. (collectively, the "Airlines")—which allegedly possess funds available to satisfy the judgment. [Dkt. No. 220]. The Court approved the entry of restraining notices against the Airlines, and ordered the parties to show cause why the Airlines should not turn over the funds Petitioners have requested. Respondent moved to vacate the restraining notices on March 15,

---

[1] The Court assumes familiarity with the facts of this case, now in its second year of contentious post-judgment discovery. *See, e.g.*, *Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, 10 Civ. 5256, 2013 WL 541259 (S.D.N.Y. Feb.11, 2013) (describing background of discovery disputes); *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, 10 Civ. 5256, 2011 WL 3516154 (S.D.N.Y. Aug. 3, 2011) (confirming arbitral award), *aff'd*, No. 11-3536-cv, 2012 WL 2866275 (2d Cir. July 13, 2012), *cert. denied*, No. 12-878, 2013 WL 182791 (Feb. 25, 2013).

1

2013, [Dkt. No. 230], and the Airlines opposed Petitioners' request on March 18, 2013. [Dkt. No. 244]. For the following reasons, Respondent's motion to vacate the restraining notices is GRANTED and Petitioners' request for the Airlines to turn over funds is DENIED.

I.   RELEVANT BACKGROUND

On January 27, 2011, Respondent disclosed to Petitioners that it received "over flight payments" from certain U.S.-based airlines. (Sun Decl. ¶¶ 8-9, Ex. E, at 4 [Dkt. No. 222]). On August 17, 2011, Petitioners sought and obtained an order to show cause that requested restraining notices against these airlines, [Dkt. No. 54], but has since voluntarily terminated those requests. (Pets.' Mem. in Supp. 1 [Dkt. No. 221]. In early 2012, Petitioners served subpoenas on the four airlines targeted in the present motion—United, Kalitta, Colt, and FedEx—which confirmed that the Airlines were obligated to pay Laos every time they flew into and out of Laos (the "Overflight Fees"), and that these obligations are invoiced by Respondent every month.[2] (Sun Decl. ¶¶ 20-22; Exs. P, Q, R).

The Overflight Fees are authorized by a Lao statute imposing an "overflight charge" on any "operator of an aircraft that has conducted a flight over the territory of the Lao PDR." Law on Civil Aviation, No. 43/PO, art. 3(3), 48 (2005) (Kry Decl. Ex. B [Dkt. No. 232]). These fees are imposed so that Respondent can provide air traffic control and other regulatory services designed "to ensure the effectiveness of overflight" in Lao airspace. *Id.* arts. 34, 38. The fees are collected by a Lao agency, *id.* art. 49, and are expended pursuant to Respondent's budget as a "central budget" item. Amended Law on the State Budget, No. 01/PO, arts. 37(6), 41 (2006) (Kry Decl. Ex. C). Similar fees are assessed by governments around the world, including by the United States. *See, e.g.*, 49 U.S.C. § 45301(a)(1).

---

[2] Kalitta Air objected to the subpoena and has not produced anything in response. Petitioners encourage restraining Kalitta as well because "it has not denied that it owes any Aviation Service Payment to Laos." (Pets. Mem. 3 n.4).

On March 4, 2013, Petitioners filed an ex parte motion for restraining notices and turnover of fees from the Airlines. [Dkt. No. 220]. The Court authorized restraining notices to be served against the Airlines preventing them from paying any debts they owe to Respondent, and entered an order requiring the Airlines to show cause why they should not "immediately deliver to Petitioners any and all funds and or payment obligations belonging or owing to Laos." (Order to Show Cause 2-4 [Dkt. No. 220]). Petitioners seek the turnover of the Overflight Fees pursuant to NY CPLR Sections 5225(b) and 5227, which authorize proceedings to recover debts owed to judgment debtors by third parties. Respondent moved to vacate the restraining notices and opposed the requested turnover proceedings on March 15, 2013. [Dkt. No. 230]. Three of the Airlines—United, Kalitta, and FedEx—filed an opposition brief on March 18, 2013. [Dkt. No. 244]. The Court held oral argument on this topic on April 3, 2013.

## II. ANALYSIS

Respondent argues the restraining notices should be vacated and the motion for turnover of funds denied. First, Respondent contends that the enforcement proceedings should be stayed pending resolution of Respondent's Rule 60(b) motion to vacate the Court's ruling upholding the arbitral award. Second, even absent such a stay, Respondent argues that Petitioners' requests are inappropriate because the Overflight Fees are immune under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*. Although the Court declines to stay proceedings pending resolution of the Rule 60(b) motion, the Court finds that Petitioners' requests are subject to the FSIA and the Overflight Fees may not be attached because they are immune under Section 1610(a) of the FSIA.[3] Consequently, the Court vacates the restraining notices and denies Petitioners' request for a turnover of funds.

---

[3] Because the Court holds the Overflight Fees to be immune under the FSIA, it need not address the equitable arguments presented by the Airlines.

3

## A. A Stay of Enforcement Proceedings Is Inappropriate

The judgment at issue in this case was rendered pursuant to the New York Convention, an international treaty authorizing U.S. courts to recognize and enforce foreign arbitral awards. *See* United Nations Convention on the Recognition of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6697 ("New York Convention"); *see also* 9 U.S.C. §§ 201 et seq. (providing statutory basis for implementing the New York Convention in the United States). The New York Convention does not, however, support the recognition of arbitral awards that have been "set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made." New York Convention art. V(1)(e); *see also Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 (2d Cir. 1999).

On December 27, 2012, the Malaysian High Court vacated the arbitral award on which the Court's original judgment is based. (Kry Decl. Ex. A). Respondent moved to vacate the Court's original judgment in light of the Malaysian ruling on February 11, 2013. [Dkt. No. 203]. Respondent now argues that the New York Convention bars further enforcement proceedings are because the arbitral award on which this Court's original judgment was based has been set aside by the rendering jurisdiction. (Resp't's Mem. in Resp. 3 [Dkt. No. 231]).

However, the Malaysian court's decision does not automatically render the original judgment invalid under the New York Convention; such a determination must wait until the Court has examined the merits of Respondent's Rule 60(b) motion, which is not yet fully briefed. (*See* [Dkt. No. 251] (extending time for Petitioners' response pending completion of limited discovery)). Absent a successful motion to stay enforcement proceedings under Rule 62 or a successful challenge under Rule 60, the Court's judgment remains valid and enforceable.

Consequently, the Court's original judgment enforcing the Malaysian arbitral award remains in effect, and proceedings to enforce that judgment must go forward.

### B. The FSIA Applies to the Remedies Petitioners Seek

Section 1609 of the FSIA provides that "the property of a foreign state in the United States shall be immune from *attachment, arrest, and execution*." 28 U.S.C. § 1609 (emphasis added). Petitioners present two arguments to support their contention that the FSIA does not apply to the remedies they seek here. First, Petitioners posit that the FSIA does not apply because the remedies they seek—restraining notices and a turnover of funds—are not subject to Section 1609. Second, Petitioners claim that the immunity provisions contained in the FSIA are superseded by the New York Convention. Neither argument has merit.

#### 1. FSIA Immunity Applies to Remedies That Are the Functional Equivalent of Attachment, Arrest, and Execution

Petitioners argue that Section 1609 applies only to the specific remedies listed in the text: "attachment, arrest, and execution." Because the remedies they seek in the instant action are *in personam*, and New York law distinguishes between *in personam* and *in rem* proceedings, Petitioners argue that this proceeding is not subject to Section 1609. (*See* Pets.' Mem. 8-9). Respondent counters that this argument is "squarely contrary to settled law" and represents an attempt to circumvent the clear provisions of the FSIA. (Resp't's Mem. 17). The Court agrees with Respondent.

Petitioners present three primary arguments to support their reading of Section 1609. First, Petitioners argue that the specific language of Section 1609, which refers only to "arrest, attachment, and execution," indicates that Congress intended execution immunity to apply only to *in rem* actions against a sovereign's property, not to *in personam* actions brought against third parties who possess the sovereign's property. (Pets.' Mem. 10-11). Second, in light of other,

5

unrelated statutory provisions using broader language to provide enforcement immunity, Petitioners argue that Congress affirmatively intended Section 1609 to apply only to the specific remedies listed. (Pets.' Mem. 11-13 (citing 28 U.S.C. § 1611(a); 22 U.S.C. § 2459)). Finally, Petitioners contend the remedies they seek here—restraining notices and turnover proceedings— are *in personam* actions outside the ambit of Section 1609. (Pets.' Mem. 15-17).

Although Petitioners cite a New York case distinguishing jurisdiction over property in *in rem* proceedings from jurisdiction over persons in *in personam* proceedings, *Koehler v. Bank of Bermuda*, 12 N.Y.3d 533, 537 (2009), Petitioners overlook Second Circuit precedent, which has repeatedly applied FSIA immunity to remedies that are the functional equivalent of attachment, arrest, and execution. For example, the Second Circuit held that an injunction against sovereign property, although not an "attachment, arrest, or execution," was immune from attachment under the FSIA as another "means to effect the same result." *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983). Similarly, the Second Circuit held that requiring a sovereign to post prejudgment security was barred by Section 1609 because it would create "precisely the same result that would obtain if the foreign sovereign's assets were formally attached" and that there was "therefore no significant distinction between New York's security requirement and an attachment of the property." *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1229 (2d Cir. 1995); *see also Karaha Bodas Co., LLC v. Ministry of Finance of Republic of Indonesia*, 83 F. App'x 381, 383 (2d Cir. 2003) (characterizing *Stephens* as "holding that the FSIA prevents restraints that are the functional equivalent of attachments").

The Second Circuit thus looks to the practical effect of the proposed remedy, not simply whether it is specifically listed in the FSIA, in analyzing whether the property is immune. *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 262 (2d Cir. 2012) (determining that

6

injunction that had no effect on sovereign's property was not barred by Section 1609, but noting that courts are barred from granting relief that is functionally equivalent to attachment). And although Petitioners concede they are "not aware of any published decisions" supporting their position, (Pets.' Mem. 7), there are many decisions applying FSIA immunity to turnover petitions. *See, e.g.*, *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280 (2d Cir. 2011) (turnover proceeding directed to third party banks); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120 (2d Cir. 2009) (restraining notices against banks); *Ruth Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389 (S.D.N.Y. 2011) (turnover proceedings against third party banks).

Moreover, the Second Circuit has already considered—and expressly rejected—a similar argument to the one Petitioners advance here. In *Stephens*, the plaintiff sought "to distinguish between an attachment—which burdens a piece of property regardless of the relationship of that property to the litigation—and the prejudgment security here at issue—which serves an enforcement mechanism for the collection of judgments in New York." *Stephens*, 69 F.3d at 1230. The Second Circuit rejected this distinction; the court explained "that the principle behind the prohibition against attachments should apply broadly," and emphasized that "such a measure could only result in the disingenuous flouting of the FSIA ban on prejudgment attachment of assets." *Id.* (internal quotation omitted); *see also S & S Mach.*, 706 F.2d at 418 (explaining that "[t]he FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property").

Petitioners' attempt to evade the FSIA's immunity is unavailing. The Court finds that the remedies they seek are functionally equivalent to the attachment of Respondent's property

7

because they involve court-ordered seizure and control. *See NML Capital*, 699 F.3d at 262. If Petitioners' argument succeeds, it would "eviscerate" the protections of the FSIA "by denominating their restraints" as a turnover proceeding "rather than as attachments of that property." *S & S Mach.*, 706 F.2d at 418. Consequently, the restraining notices and turnover proceedings are subject to the immunity provisions of the FSIA.

    2. <u>The New York Convention Does Not Override the FSIA's Execution Immunity Provisions</u>

Petitioners also argue that the immunity provisions of the FSIA are subordinate to the New York Convention because these provisions were enacted "[s]ubject to existing agreements" to which the United States was a party at the time the FSIA was enacted, including the New York Convention. 28 U.S.C. §§ 1604, 1609; *see also Skandia America Reins. Corp. v. Caja Nacionale de Ahorro y Segoro*, No. 96 Civ. 2601, 1997 WL 278054, *5-6 (S.D.N.Y. May 23, 1997) (Wood, J.) (holding New York Convention was an "existing agreement" to which FSIA immunity is subject). However, the only provision of the New York Convention Petitioners identify as surmounting FSIA execution immunity is Article III, which states that contracting states shall "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." New York Convention art. III. Petitioners contend that this provision supports a finding that a turnover proceeding pursuant to Section 5225(a) of the NY CPLR is an appropriate mechanism to enforce the award.

Petitioners' argument is misplaced. The Court has held that the state remedies they seek are subject to the immunity provisions of the FSIA. The New York Convention does nothing more than direct the Court to enforce awards in accord with the procedural rules of this jurisdiction; it contains no language that conflicts with or supersedes FSIA immunity. The immunity provisions in the FSIA apply to this action.

### C. The Overflight Fees are Immune from Attachment Under the FSIA

Under Section 1609 of the FSIA, a foreign state's property is "immune from attachment, arrest and execution" unless it is subject to one of the limited exceptions laid out in sections 1610 and 1611.  Where, as here, a foreign sovereign has waived its sovereign immunity, *Thai Lao Lignite*, 2011 WL 3516154, at *7-8, or is subject to a judgment based on an order confirming an arbitral award, 28 U.S.C. § 1610(a)(6), its property may be attached only if the property is "used for a commercial activity in the United States." 28 U.S.C. § 1610(a).  Petitioners argue that Respondent has waived its immunity and, even if it has not, the Overflight Fees are subject to attachment because they are used for a commercial purpose in the United States.  The Court finds that Respondent did not and could waive its immunity, and that the Overflight Fees are immune from attachment under the FSIA.

#### 3. Respondent Has Not Waived Its Immunity Argument

Petitioners argue that Respondent has "intentionally and unambiguously" waived its right to argue that the Overflight Fees are immune under the FSIA. (Pets.' Mem. 6).  Petitioners ground this argument on statements Respondent made in briefing to the Second Circuit and to this Court which implied that the Overflight Fees are not immune under the FSIA. (*See* Sun Decl. Ex. K ("[E]xcept for some U.S.-based airlines' payments for overflight fees to Laos, there are no assets in the United States available to [enforce the award.]"); Ex. L ("Other than invoices that the government sends from Laos to U.S. airlines that overfly Laos, the government has no commercial assets in the United States.")).

Petitioners' waiver argument is unavailing.  First, implied waiver of immunity under the FSIA must be "construed narrowly," and "any waiver must accordingly be unmistakable and unambiguous."  *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d

9

317, 326 (2d Cir. 1993) (citing *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)). The sovereign must commit "some affirmative act" to indicate that it intended to relinquish a known right. *Walters*, 651 F.3d at 295-96; *see also id.* at 295 (noting that "a waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and vice versa" (internal quotation omitted)). Respondent did not explicitly waive execution immunity against this property, and the statements Petitioners contend constitute an implicit waiver fall far short of the "unmistakable and unambiguous" waiver required by the Second Circuit. Rather, Respondent's statements were conditional and, with respect to the statement made before this Court, part of a larger argument that Respondent has no assets available to satisfy the judgment. (*See* Sun Decl. Ex. L, at 11 ("The government has no commercial assets in the United States.")). These representations are insufficient to overcome the strict standard for implied waiver of execution immunity.

Second, Respondent could not waive its immunity because sovereign property must satisfy the statutory criteria laid out in Section 1610(a) "*even if* the foreign sovereign has waived its immunity." *Aurelius Capital Partners*, 584 F.3d at 130 (emphasis added); *see also EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 481 n.19 (2d Cir. 2007) ("Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these…statutory criteria." (internal quotation omitted)). The statutory criteria are mandatory regardless of whether a sovereign has waived execution immunity; thus, irrespective of any waiver, only those assets "used for a commercial activity in the United States" may be properly attached under the FSIA.[4] *Aurelius Capital Partners*, 584 F.3d at 130.

---

[4] Although Respondent raised this point in its opposition briefing, Petitioners did not provide any authority to the contrary in its reply. (*See* Resp't's Mem. in Resp. 11 (discussing that a sovereign cannot waive immunity of non-commercial assets); Pets.' Reply Mem. 5-7 (raising waiver issue without addressing this issue) [Dkt. No. 248]).

10

      4.  <u>The Overflight Fees are Used for a Commercial Purpose in the United States</u>

In order to be subject to attachment, the Overflight Fees must be *both* (1) used for a commercial activity and (2) used in the United States. 28 U.S.C. § 1610(a). Because neither criterion is satisfied, the Overflight Fees are immune from attachment under the FSIA.

To distinguish between sovereign and commercial activity, the Second Circuit directs the Court to ask "whether the particular actions that the foreign state performs are the type of actions by which a private party engages in trade and traffic or commerce." *NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 258 (2d Cir. 2012). In other words, "if the activity is one in which a private person could engage, it is not entitled to immunity." *LNC Invs., Inc. v. Republic of Nicaragua*, 2000 WL 745550, at *5 (S.D.N.Y. 2000) (quoting *Texas Trading & Milling Corp. v. Red. Republic of Nigeria*, 647 F.2d 300, 309 (2d Cir. 1981)). The government's purpose in conducting the activity is irrelevant; the only concern is whether the sovereign acted "in the manner of a private actor." *NML Capital*, 680 F.3d at 260 (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992)). The Second Circuit applies this standard strictly. *Compare Anglo-Iberia Underwriting Management v. P.T. Jamsostek*, 600 F.3d 171, 177-78 (2d Cir. 2010) (holding that private actor's role in the administration of Indonesia's national health insurance program was sovereign, not commercial, activity), *with NML Capital*, 680 F.3d at 260 (holding purchase of scientific equipment was a commercial, not sovereign, function).

The Overflight Fees are collected pursuant to a Lao statute and used to regulate airlines in Laos. *See* Law on Civil Aviation art. 3(3), 48 (Kry Decl. Ex. B). The fees are charged in order to permit Respondent to provide air traffic control and other services, a public regulatory function not analogous to any action taken by private parties. *Id.* art. 34. The Overflight Fees are thus directly parallel to other taxes sovereign states assess against transportation companies, including airlines, which are immune from attachment as sovereign activity. *See, e.g.*, *LNC*

11

*Invs.*, 2000 WL 745550 (finding corporate income and value added taxes airlines owed to Nicaragua immune from attachment); *Export-Import Bank of Republic of China v. Grenada*, 876 F. Supp. 2d 263, 267 (S.D.N.Y. 2012) (finding taxes owed to Grenada by airlines, cruise ships, and shipping companies to be immune from attachment as sovereign activity).

Moreover, several foreign courts have expressly held that overflight fees may not be attached to satisfy judgments because they represent a sovereign function. *See, e.g.*, Bundesgerichtshof Oct. 4, 2005, Case No. VII ZB 9/05 (highest civil court of Germany holding that overflight fees owed the Russian government represent sovereign function) (Kry Decl. Ex. E); *Socialist Federal Republic of Yugoslavia v. Société Européenne d'Etudes et d'Entreprises*, 82 I.L.R. 58 (T.G.I. Paris July 3, 1985) (holding overflight fees immune from attachment to satisfy arbitral award as an exercise of "prerogative powers linked to its national and international sovereignty") (Kry Decl. Ex. G). Comity concerns thus support a finding that the collection of Overflight Fees constitutes sovereign, not commercial, activity.[5]

Finally, even if the Overflight Fees were commercial activity, they would nonetheless be immune under the FSIA because the Overflight Fees were not used in the United States. Although Petitioners apply New York law to argue that the Overflight Fees are located in the United States because "the situs of the debt is wherever the debtor is found,"[6] (Pets.' Mem. 187-18), Respondent correctly notes that the appropriate inquiry examines whether the property at issue was used in the United States when in the hands of the sovereign. *See Aurelius Capital Partners*, 584 F.3d at 130-31. For example, the Second Circuit determined in *Aurelius Capital Partners* that assets were immune from attachment even though they had been used in the United

---

[5] The Court also notes that the United States assesses similar overflight fees. *See* 49 U.S.C. § 45301(a)(1). Given the Court's ruling that such fees are immune from attachment as sovereign activity, principles of comity may mitigate against potential attachment of these payments in future proceedings against the Untied States.

[6] Petitioner supplies no federal authority for its assertion that New York law would have any bearing on the application of a federal immunity statute. (*See* Pets.' Mem. 17-18

States by private corporations. *Id.* at 131. Because these actions occurred before Argentina took possession of the assets, the assets were immune under Section 1610(a). Similarly, the invoices for the Overflight Fees direct the Airlines to submit payment to banks outside of the United States, and Respondent has no opportunity to "use" the fees in the United States.

In sum, the Overflight Fees are sovereign activity outside the United States, and consequently are not "used for a commercial activity in the United States." The Court accordingly holds that these fees are immune under 28 U.S.C. § 1610(a).

### III.    CONCLUSION

For the foregoing reasons, the Court GRANTS Respondent's motion to vacate the restraining notices issued on March 4 and DENIES Petitioners' motion to commence turnover proceedings against the Airlines.

SO ORDERED.

Dated: New York, New York
       April 19, 2013

/s/_____
Kimba M. Wood
United States District Judge