UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                    |

THAI-LAO LIGNITE (THAILAND) CO., LTD.  |
HONGSA LIGNITE (LAO PDR) CO., LTD.,     |
                                      |

                  Petitioners,    |     10-CV-5256 (KMW) (DCF)
    -against-                 |
                                      |     <u>OPINION & ORDER</u>
GOVERNMENT OF THE LAO PEOPLE'S    |
DEMOCRATIC REPUBLIC,           |
                                      |
                  Respondent.    |
                                      |
------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

      On August 5, 2011, this Court entered a judgment against the Government of the Lao

People's Democratic Republic ("Respondent") enforcing a $57 million arbitral award in favor of

Thai-Lao Lignite (Thailand) Co., Ltd. ("TLL") and Hongsa Lignite (Lao PDR), Co. Ltd. ("HLL")

(collectively, "Petitioners").  [Dkt. No. 50].  On December 27, 2012, the Malaysian High Court

vacated the arbitral award underlying the Court's judgment.  (Kry Decl. Ex. A & B [Dkt. No. 205]).

In light of that ruling, Respondent moves to vacate the Court's judgment enforcing the arbitral

award pursuant to Federal Rule of Civil Procedure 60(b)(5) and Article (V)(1)(e) of the United

Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10,

1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "New York Convention"), as implemented by the

Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq*.  Petitioners urge the Court to require Respondent to

post security as a condition of moving under Rule 60(b) or as a condition for the entry of any order

vacating the judgment.  For the reasons that follow, Respondent's motion is GRANTED and

Petitioners' request is DENIED.

I.      Relevant Background[1]

     1.      The Project Development Agreement and Arbitration

This case concerns a dispute between TLL, HLL, and Respondent arising out of a Project Development Agreement ("PDA") that TLL and Respondent entered into on July 22, 1994. In Article 14.1(i) of the PDA, TLL and Respondent agreed to submit any dispute arising out of the PDA to arbitration in Kuala Lumpur, Malaysia.  The PDA further provided that:

> Any award or determination of the arbitral panel shall be final, nonappealable, binding, and conclusive upon the parties, and judgment may be entered in any court of competent jurisdiction.  The parties waive to the extent permitted by law any rights to appeal or any review of such award by any court or tribunal of competent jurisdiction.

(*Id*. art. 14.1(vi)).  Respondent affirmatively waived sovereign immunity "from jurisdiction, attachment (both before and after judgment), and execution to which it might otherwise be entitled in any action or proceeding relating in any way to this Agreement."  (*Id.*, art. 14.2.).

On October 5, 2006, Respondent sent Petitioners a Notice of Termination of the PDA; on July 26, 2007, Petitioners initiated arbitration.  Petitioners contended that Respondent violated the PDA by improperly seeking to terminate it without cause, and without following the procedures for termination outlined in the agreement.  Respondent argued that neither TLL nor HLL had standing to bring this claim.  The arbitral panel concluded that both TLL and HLL had standing to bring the claim under the PDA because TLL was a signatory to the PDA, and HLL was an "intended beneficiary" of the PDA.

---

[1] The underlying facts of this case are stated in detail in the Court's opinion confirming the arbitral award, familiarity with which is assumed.  *See Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic,* 10 Civ. 5256, 2011 WL 3516154, at *2–7 (S.D.N.Y Aug. 3, 2011) (Wood, J.) ("*Thai-Lao I*"), *aff'd*, 492 F. App'x 150 (2d. Cir. 2012), *cert. denied*, 2013 WL 182791 (Feb. 21, 2013).  Only facts relevant to the present analysis are repeated here.  Facts concerning subsequent developments are drawn from the parties' respective submissions and are undisputed unless otherwise noted.

The panel further concluded that Respondent had breached the PDA by improperly terminating it, and thus that Petitioners were entitled, under the PDA, to damages, including "TLL's total investment cost plus a premium and consideration of the Lenders and Investors." (*Id.* art. 15.1). The panel determined that "total investment cost" meant "the total amount of money that [TLL and HLL] together, on behalf of TLL, reasonably and unavoidably actually expended out-of-pocket in the normal course of preparation for performance or in performance up until the date of breach." (Award ¶ 114 [Dkt. No. 9-1]). The panel concluded that "premium" meant an "an allowance for a reasonable return on [TLL and HLL's] total investment costs to be set by the arbitration panel in its judgment." (*Id.* ¶ 127). Examining the evidence in the record, the panel awarded Petitioners $57,210,000 in damages, which included the total investment cost, a premium, interest, and attorneys' fees. Subsequently, Petitioners initiated proceedings seeking to enforce the arbitral award against Respondent.

### 2. Enforcement Proceedings in New York

In New York, Petitioners initially filed their petition to confirm the award in the Supreme Court of the State of New York, New York County, Commercial Division, on June 8, 2010. On July 9, 2010, Respondent removed the case to this Court. On October 1, 2010, Respondent filed a motion to dismiss and asked the Court to stay its consideration of the petition pursuant to Article VI of the New York Convention, pending the outcome of a proceeding to set aside the arbitral award that Respondent had filed in Malaysia. On October 13, 2010, Respondent withdrew the portion of its motion that sought a stay. On August 3, 2011, this Court denied Respondent's motion to dismiss and granted Petitioners' petition to confirm the arbitral award. The Second Circuit Court of Appeals affirmed, and the U.S. Supreme Court denied certiorari.

### 3. Malaysian Litigation

3

On October 19, 2010, Respondent initiated proceedings to set aside the arbitral award in the High Court of Malaya at Kuala Lumpar.  Under Malaysian law, a challenge to an arbitral award must be made within ninety days of receipt of the award.  (Reply Decl. of Grace Xavier, Ex. B, at 29).  The High Court dismissed the action because it was filed nine months after the award was issued.  The High Court declined to exercise its discretion to waive the timeliness requirement, finding that the delay was "inordinate . . . as the [Respondent] had adequate legal representation." (Malaysian High Court Judgment of April 15, 2011, at 8 [Dkt. No. 83-3]).

The Malaysian Court of Appeal reversed, holding that Respondent "should not be prejudiced by the fact that it was not conversant with local law requirements and did not receive adequate advice from its legal advisors to enable the application to set aside the award to be made within time in Malaysia."  (Malaysian Court of Appeal Judgment of July 26, 2011, at 13 [Dkt. No 83-5]).  The Court of Appeal remanded the case to the High Court to decide the merits of the petition.

On remand, the Malaysian High Court set aside the arbitral award.  The High Court agreed with Respondent that the arbitrators had exceeded their jurisdiction and thereby violated §§ 37(1)(a)(iv) and (v) of Malaysia's Arbitration Act of 2005.  Under § 37(1)(a)(iv), an arbitral award may be set aside if the award deals with a dispute not contemplated by, or not falling within, the terms of the arbitral agreement; under § 37(1)(a)(v), an award may be set aside if the award contains decisions on matters beyond the scope of the arbitral agreement.  (Malaysian High Court Judgment of March 1, 2013, at 10–11 [Dkt. No. 271-10]).  The High Court found that the arbitrators had exceeded the jurisdiction granted to them by the PDA by (1) assuming jurisdiction over disputes concerning two contracts the parties had entered into before the PDA was created, (*id.* at 52–63);[2]

---

[2] Specifically, the High Court found that in calculating damages under the PDA, the arbitral panel included costs incurred by TLL and HLL pursuant to the two previous contracts. (Malaysian High Court Judgment of March 1, 2013, at 52–63).

and (2) admitting and adjudicating claims by non-parties to the PDA, *(id.* at 57–63, 81–91).[3]  The High Court ordered re-arbitration of the dispute before a new panel of arbitrators.  (*Id.* at 91–92). Petitioners appealed the High Court's decision.  The Malaysian Court of Appeal agreed with the High Court that the arbitrators had exceeded the jurisdiction granted to them by the PDA and affirmed the High Court's decision.  (Malaysian Court of Appeal Judgment of January 24, 2014, 15–17 [Dkt. No. 315]).

II.    Discussion

In light of the Malaysian High Court's ruling setting aside the arbitral award, Respondent moves, pursuant to Federal Rule of Civil Procedure 60(b)(5) and Article (V)(1)(e) of the New York Convention, for an order vacating this Court's August 5, 2011, judgment.  Respondent argues that the New York Convention calls for vacatur under the circumstances of this case, and that under *Baker Marine v. (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir. 1999), vacatur is *required* absent extraordinary circumstances not present here.  Petitioners urge the Court to deny Respondent's motion, arguing that (1) Respondent's inequitable conduct precludes it from seeking equitable relief under Rule 60(b); (2) neither the New York Convention nor Second Circuit case law requires vacatur; and (3) there are adequate reasons for this Court not to defer to the Malaysian judgment.

1.  Background Law and Precedent

---

[3] The High Court found that in calculating damages under the PDA, the arbitral panel included costs incurred by entities (that were not signatories to the PDA) under the two previous contracts.  (*Id.* at 57–63, 81–91).  The non-parties included HLL as well as two other entities, Thai–Lao Power Co., Ltd. ("TLP") and South East Asia Power Co. Ltd. ("SEAP").  TLL organized TLP to implement the PDA and to be the operating company for the project.  SEAP was a company formed to raise funds for the project and was wholly owned by the principal and CEO of TLL. The High Court also found that HLL was improperly admitted into the arbitration as a third-party beneficiary of the PDA.  (*Id.* at 63–80).

The New York Convention "provides a carefully crafted framework for the enforcement of international arbitral awards."  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).  The Second Circuit has explained that:

> [T]he Convention mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought.  The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief.  However, the Convention is equally clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997).  "Under the Convention, 'the country in which, or under the [arbitration] law of which, [an] award was made' is said to have primary jurisdiction over the arbitration award.  All other signatory States are secondary jurisdictions . . ."  *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357, 364 (5th Cir. 2003).

Article V(1)(e) of the New York Convention provides that recognition and enforcement of an arbitral award by a court with secondary jurisdiction over an arbitral award "may be refused, at the request of the party against whom it is invoked" if the award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." "Pursuant to this provision of the Convention, a secondary Contracting State normally may not enforce an arbitration award that has been lawfully set aside by a 'competent authority' in the primary Contracting State."  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).  Petitioners do not contest that the Malaysian High Court is a "competent authority" as defined by Article V(1)(e); rather, Petitioners argue that this Court has the discretion not to defer to the Malaysian court's decision.

6

a.   District Court's Discretion to Enforce a Vacated Arbitral Award

There are few decisions defining the scope of the discretion a court with secondary jurisdiction has to enforce an arbitral award that has been vacated by a court with primary jurisdiction over the award.  Only two Circuit Courts of Appeal have addressed the issue, the Second Circuit Court of Appeals in *Baker Marine v. (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir. 1999) and the D.C. Circuit Court of Appeals in *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007).

In *Baker Marine*, the Second Circuit Court of Appeals held that where a court with primary jurisdiction over an arbitral award issues a decision setting aside the award, U.S. courts will honor that decision in the absence of an "adequate reason" not to do so.  In *Baker Marine*, three companies agreed to arbitrate any of their business disputes in Nigeria, under the laws of Nigeria. 191 F.3d at 195.  Arbitration ensued and resulted in two awards to Baker Marine of a total of $2.98 million.  *Id.* at 196.  Baker Marine sought enforcement of the arbitral awards in Nigeria, but the Nigerian courts set aside the awards.  *Id.*  In one case, the Nigerian court found that "the arbitrators had improperly awarded punitive damages, gone beyond the scope of the submissions, incorrectly admitted parole evidence, and made inconsistent awards, among other things." *Id.*  In another case, the Nigerian court found that the award was not supported by the evidence.  *Id.*  Baker Marine then brought an action in the Northern District of New York seeking confirmation of the awards.  *Id.* The district court denied Baker Marine's petition, "concluding that under the Convention and principles of comity, it would not be proper to enforce a foreign arbitral award . . . when such an award has been set aside by the Nigerian Courts."  *Id.* (quotation marks omitted).  The Second Circuit affirmed.  *Id.* at 198.

7

Baker Marine made two principal arguments on appeal.  First, Baker Marine argued that "the awards were set aside by the Nigerian courts for reasons that would not be recognized under U.S. law as valid grounds for vacating an arbitration award, and that under Article VII [of the New York Convention], it may invoke this country's national arbitration law, notwithstanding the action of the Nigerian court."  *Id.* at 196–97.  The Second Circuit rejected Baker Marine's first argument, holding that:

> It is sufficient answer that the parties contracted in Nigeria that their disputes would be arbitrated under the laws of Nigeria. . . . Nothing suggests that the parties intended United States domestic arbitral law to govern their disputes. . . . Furthermore Baker Marine has made no contention that the Nigerian courts acted contrary to Nigerian law.

*Id.* at 197.  Second, Baker Marine argued that the Article (V)(1)(e)'s use of the term "'may,' rather than a mandatory term implies that the court might have enforced the awards, notwithstanding the Nigerian judgments vacating them."  *Id.*  The Second Circuit also rejected this argument, stating that, "It is sufficient answer that Baker Marine has shown no adequate reason for refusing to recognize the judgments of the Nigerian court."  *Id.*

In a footnote, the Second Circuit distinguished the facts in *Baker Marine* from the facts in *In re Chromalloy Aeroservices*, 939 F. Supp. 907 (D.D.C. 1996) [hereinafter *Chromalloy*].  In *Chromalloy*, Egypt and a U.S. company (CAS) had entered into an agreement providing that disputes would be submitted to arbitration in Egypt and that the arbitral panel's decision "shall be final and binding and cannot be made subject to any appeal or other recourse."  *Id.* at 908, 912.  The arbitral panel ordered Egypt to pay CAS monetary damages.  *Id.* at 908.  CAS subsequently filed a petition in the District Court for the District of Columbia ("D.C. District Court") seeking enforcement of the arbitral award.  *Id.* at 908.  Shortly thereafter, Egypt filed an appeal with the Egyptian Court of Appeal seeking to set aside the award.  *Id.*  The Egyptian Court of Appeal suspended the award, and Egypt filed a motion in the D.C. District Court to dismiss CAS's petition

8

to enforce the award.  *Id.*  The district court held that the arbitration award was valid and

enforceable, because Egypt's appeal to the Egyptian Court of Appeal abrogated Egypt's contractual

promise not to appeal the award, and recognizing the result of the appeal would violate the "U.S.

public policy in favor of final and binding arbitration of commercial disputes."  *Id.* at 913.  The

Second Circuit distinguished *Chromalloy* on its facts, emphasizing that, (1) unlike the petitioner in

*Chromalloy*, Baker Marine was not a U.S. citizen and did not initially seek confirmation of the

award in the U.S.; and (2) unlike Egypt, the companies in *Baker Marine* did not violate a promise in

appealing the arbitral award.  191 F.3d at 197 n.3.

The only other Circuit Court of Appeals that has considered the issue of enforcing a vacated,

foreign arbitration award is the D.C. Circuit Court of Appeals in *TermoRio S.A. E.S.P. v. Electranta*

*S.P.*, 487 F.3d 928 (D.C. Cir. 2007) [hereinafter *TermoRio*].  In *TermoRio*, the D.C. Circuit Court of

Appeals held that normally a court sitting in secondary jurisdiction should not enforce an arbitral

award vacated by a court with primary jurisdiction over the award, but that there are certain

circumstances in which doing so may be appropriate.  *Id.* at 936, 938.  In that case, TermoRio S.A.

E.S.P. ("TermoRio") and Electrificadora del Atlantico S.A. E.S.P. ("Electranta"), a Colombian

public utility company, entered into a contract that provided for any dispute between the parties to

be resolved by binding arbitration in Colombia.  *Id*. at 930.  An arbitral panel ordered Electranta to

pay TermoRio damages, *id.* at 931, but subsequently Colombia's highest administrative court set

aside the arbitration award on the ground that the arbitration clause in the parties' contract violated

Colombian law, *id.* at 929.  TermoRio then filed suit in the District Court for the District of

Columbia seeking enforcement of the arbitral award.  *Id.*  The district court dismissed the action for

failure to state a claim upon which relief could be granted and, in the alternative, on the ground of

*forum non conveniens*.  *Id.* at 929–30.  The D.C. Circuit affirmed.  *Id.* at 930.

Like Baker Marine, TermoRio argued that the "may" in Article V(1)(e) of the New York Convention gave U.S. courts the discretion to enforce an award, notwithstanding that it had been vacated in another country.  *Id.* at 936.  Specifically, TermoRio contended "that 'a state is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests.'"  *Id.*  TermoRio argued that the district court should have exercised this discretion "because 'the [Colombian court's] decision was contrary to both domestic Colombian and international law; recognition of that decision would frustrate clearly expressed international and United States policy; and the process leading to the nullification decision demonstrated the Colombian government's determination to deny Plaintiffs fair process.'"  *Id.* at 937.  The D.C. Circuit Court of Appeals rejected TermoRio's arguments, stating that:

> Accepting that there is a narrow public policy gloss on Article V(1)(e) of the Convention and that a foreign judgment is unenforceable as against public policy to the extent that it is "repugnant to fundamental notions of what is decent and just in the United States," [TermoRio's] claims still fail.  [TermoRio] [has] neither alleged nor provided any evidence to suggest that the parties' proceedings before [the Colombian court] or the judgment of that court violated any basic notions of justice to which we subscribe.

*Id.* at 939 (internal citation omitted).

In affirming the district court's decision, the D.C. Circuit "generally subscribe[d] to the reasoning of the Second Circuit in *Baker Marine*," *id.* at 935, which it found "consistent with the view that, '[w]hen a competent foreign court has nullified a foreign arbitration award, United States courts should not go behind that decision absent extraordinary circumstances not present in this case," *id.* at 938 (citation omitted).  The Court found that, "Because there is nothing in the record . . . indicating that the proceedings before the [Colombian court] were tainted or that the judgment of that court is other than authentic, the District Court was, as it held, obliged to respect it."  *Id.* at 930.  Enforcing the award "would seriously undermine a principal precept of the New York Convention:

an arbitration award does not exist to be enforced in other Contracting States if it has been lawfully 'set aside' by a competent authority in the State in which the award was made." *Id.* at 936.

The most recent decision concerning the enforcement of a vacated arbitral award was issued by Judge Hellerstein of this Court.  In *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("COMMISA") v. PEMEX-Exploración y Producción ("PEP")*, 10 Civ. 206, 2013 WL 4517225 (S.D.N.Y. Aug. 27, 2013) (Hellerstein, J.) [hereinafter *PEMEX*], COMMISA and PEP, an instrumentality of Mexico, entered into two contracts that provided that disputes would be arbitrated. *Id.* at *2.  Each party accused the other of breaching contractual obligations; after conciliation efforts failed, COMMISA initiated arbitration.  *Id.*  Two weeks later, PEP issued an administrative rescission of the contracts. *Id.*  While the arbitration was under way, two new statutes were passed in Mexico. *Id.* at *5.  The first statute gave the Tax and Administrative Court jurisdiction over any case challenging an administrative rescission (so long as the challenge was filed within 45 days of the purported rescission).  *Id.*  The second statute stated that challenges to administrative rescissions could no longer be arbitrated.  *Id.*  The arbitral panel issued an award in favor of COMMISA.  *Id.* at *1.  COMMISA subsequently sought and obtained an order from Judge Hellerstein confirming the award.  *Id.*  PEP appealed that order to the Second Circuit Court of Appeals, and concurrently filed proceedings in the Mexican courts to nullify the award.  *Id.*  In Mexico, PEP filed suit in the Fifth District Court seeking to nullify the arbitral award on the grounds that the dispute between it and COMMISA was not arbitrable and that the award conflicted with Mexican public policy.  *Id.* at *6.  The Fifth District Court dismissed the action, holding that PEP had waived its argument of non-arbitrability, and, alternatively that the award did not violate Mexican public policy.  *Id.*  PEP then filed a petition for an indirect *amparo*[4] in the Tenth District

---

[4] As Judge Hellerstein explained, "[a]n *amparo* action is a judicial challenge to the validity or constitutionality of acts of a government authority."  *PEMEX*, 2013 WL 4517225, at *3 n.5

Court to challenge the decision of the Fifth District Court. *Id.* at *7. The Tenth District Court dismissed the action, holding that the dispute was arbitrable. *Id.* PEP appealed to the Eleventh Collegiate Court. *Id.* The Eleventh Collegiate Court held that the award was invalid, relying in part on the second new statute, reversed the Fifth District Court's decision, and remanded the case to the Fifth District Court to issue an order nullifying the award. *Id.* at *7–8. The Fifth District Court subsequently issued a judgment in favor of PEP. *Id.* at *8. By the time the Eleventh Collegiate Court issued its opinion, the 45-day statute of limitations had expired, in the only forum that could hear the dispute, leaving COMMISA with no remedy. *Id.* at *17.

In light of the Eleventh Collegiate Court's decision, the Second Circuit Court of Appeals remanded the case to Judge Hellerstein to address what effect the nullification should have on the arbitral award and his decision confirming the award. *Id.* at *1. Article V of the Panama Convention, like Article V of the New York Convention, states that "recognition and execution of [the arbitral award] may be refused" if the award has been nullified by a "competent authority" of the state in which, or according to the law of which, the arbitration award was conducted. *Id.* at *14. Judge Hellerstein found that the use of the word "may" gave him some discretion, but noted that due to the Second Circuit's opinion in *Baker Marine* and the D.C. Circuit's opinion in *TermoRio*, that discretion was "narrow." [5] *Id.* He noted that *Baker Marine* did not define the scope of a court's discretion, but that *TermoRio* did so as follows: if the judgment of nullification "is repugnant to fundamental notions of what is decent and just in the United States" or, if the judgment "violated any basic notions of justice in which we subscribe," then it need not be followed. *Id.*; *see also TermoRio*, 487 F. 3d at 938. Applying the *TermoRio* standard, Judge Hellerstein declined to

---

[5] Although COMMISA's petition to confirm the arbitral award invoked the Inter-American Convention on International Commercial Arbitration (the "Panama Convention") and *Baker Marine* and *TermoRio* interpreted the New York Convention, Judge Hellerstein noted that, "[t]he Panama Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the 'New York Convention') are largely similar, and so precedents under one are generally applicable to the other." *PEMEX*, 2013 WL 4517225, at *10.

defer to the Eleventh Collegiate Court's decision, and again confirmed the arbitral award, finding that "the Eleventh Collegiate Court's decision violated basic notions of justice in that it applied a law that was not in existence at the time the parties' contract was formed and left COMMISA without an apparent ability to litigate its claims." *PEMEX*, 2013 WL 4517225, at *14.

2. Application

The use of the permissive "may" in Article (V)(1)(e) of the New York Convention gives this Court discretion to enforce a foreign arbitral award where the award has been nullified by a court in the state with primary jurisdiction over the award. That discretion, however, is narrowly confined. *PEMEX*, 2013 WL 4517225, at *14. Its scope is stated explicitly in *TermoRio*. That discretion may be exercised only when the foreign judgment setting aside the award is "'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought,'" *TermoRio*, 487 F. 3d at 938 (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981)), or violates "basic notions of justice," *id.* This "standard is high and infrequently met" and should be found "[o]nly in clear-cut cases." *Id.* (quotation marks omitted).

Petitioners fail to demonstrate that the circumstances of this case meet the "extraordinary circumstances" envisioned by *TermoRio* and found to exist by Judge Hellerstein in *PEMEX*. As described below, the alleged errors Petitioners point out in the proceedings before the Malaysian courts and in the judgments of those courts do not rise to the level of violating basic notions of justice such that the Court here should ignore comity considerations and disregard the Malaysian judgments.

a. The Malaysian Proceedings Did Not Violate "Basic Notions of Justice"

Petitioners first argue that this Court should deny Respondent's motion "as a result of Respondent's longstanding pattern of inequitable conduct with respect to the award and this Court's

proceedings." (Petitioners' Memorandum of Law in Opposition to Respondent's Motion to Vacate the Judgment Pursuant to Rule 60(b)(5), at 15 [Dkt. No. 273] [hereinafter Petitioners' Memo of Law]).[6] Most of the "inequitable conduct" highlighted by Petitioners involves Respondent's behavior before this Court; however, in deciding whether to defer to the Malaysian courts' judgments it is not Respondent's actions before *this* Court that are relevant; the relevant conduct consists of the actions before and judgments of the *Malaysian* courts.[7] *See TermoRio*, 487 F.3d at 939 ("[A]ppellants' claims still fail. Appellants have neither alleged nor provided any evidence to suggest that the parties' proceedings before Colombia's Consejo de Estado or the judgment of that court violated any basic notions of justice to which we subscribe."); *Baker Marine*, 191 F.3d at 197 ("Baker Marine has made no contention that the Nigerian courts acted contrary to Nigerian law.").

The Court will not disregard comity considerations and refuse to recognize the Malaysian courts' judgments unless Petitioners can demonstrate that the process before the Malaysian courts "violated basic notions of justice." *TermoRio*, 487 F.3d at 930, 939. Petitioners present three arguments for refusing to recognize the Malaysian courts' judgments based on Respondent's inequitable conduct before those courts; however, none of these arguments meets the strict standard announced in *TermoRio*.

Petitioners first point out that Respondent "commenced a proceeding in Malaysia to set aside the award in violation of its express covenant not to commence such a proceeding and its covenant to abide by the award." (Petitioners' Memo of Law, at 16). Petitioners argue that "[a]t the

---

[6] Petitioners' list of Respondent's inequitable conduct ranges from Respondent's refusal to voluntarily comply with discovery requests in this proceeding, to Respondent's failure to pay sanctions ordered by this Court. (Petitioners' Memo of Law, at 15). Respondent contests many of the allegations of inequitable conduct asserted by Petitioners. *See* (Government of The Lao People's Democratic Republic's Reply in Support of its Motion to Vacate the Judgment Pursuant to Rule 60(b)(5), at 11–12 [Dkt. No. 279] [hereinafter Respondent's Reply Memo]); (Branson Decl. ¶¶ 4–95).

[7] Respondent's alleged inequitable conduct before this Court was addressed by this Court in two opinions deciding motions for sanctions brought by Petitioners. *See Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, 2011 WL 4111504 (S.D.N.Y. Sept. 13, 2011) (Wood, J.) (partially granting Petitioners' motion for sanctions); *Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 10 CIV. 5256, 2013 WL 3970823, at *6 (S.D.N.Y. Aug. 2, 2013) (Wood, J.) (denying Petitioners' motion for sanctions).

very least, Respondent's undisputed breach of an express covenant not to bring a judicial challenge of the award should operate to bar Respondent from using the product of that breach to request extraordinary, equitable relief from this Court." (*Id.* at 20). However, the covenant in question here provided that, "The parties waive *to the extent permitted by law* any rights to appeal or any review of such award by any court or tribunal of competent jurisdiction." (PDA, art. 14.1(vi) (emphasis added)). Petitioners' argument is unavailing. The only courts competent to set aside the arbitral award are the courts of Malaysia, the country that has primary jurisdiction over the award, *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287 (5th Cir. 2004), and the only evidence before this Court with respect to whether Malaysian law allows a party to waive the right to seek judicial review of an arbitral award is the opinion of Grace Xavier, a research fellow at the University of Malaya in Kuala Lumpur, Malaysia, that Malaysian law does *not* permit such a waiver. *See* (Reply Declaration of Grace Xavier ¶ 3 ("In my opinion, as the authorities have shown, Malaysian law does not permit a waiver of a party's statutory right to seek review of an arbitration award.")).

Second, Petitioners argue that Respondent "based its action to set aside the award in Malaysia upon an affidavit made by an affiant who did not have personal—or in some cases, **any**— knowledge of the facts to which he averred, including those ultimately relied upon by the Malaysian courts in extending the statute of limitations for commencing Respondent's action to set aside the award." (Petitioners' Memo of Law, at 16). The affidavit stated that "[Respondent's] legal advisors in the arbitration did not advise [Respondent] after the Award was delivered of the provision . . . requiring the arbitration Award to be set aside within a specified timeline." (Sun Decl. Ex. E ¶ 53(d)). Petitioners contend that this affidavit could not provide a basis for the Court of Appeal's determination as "subsequent discovery confirms that the witness who claimed that

15

Respondent had not been advised of the statute of limitations, had himself spoken to Respondent's arbitration counsel fewer than five times, had never spoken to [the second law firm representing Respondent], and had no idea whether any other member of the Lao Government had been advised of the deadline." (Petitioners' Memo of Law, at 21). Even accepting arguendo these facts, the witness's affidavit contains an adequate basis for the Court of Appeal's conclusion. The witness "(1) did not have personal knowledge of any instance when arbitration counsel informed [Respondent] about the deadline; (2) . . . was a member of the [Respondent's] committee overseeing the arbitration and was present at committee meetings where arbitration counsel's failure to advise [Respondent] about the deadline was discussed; and (3) the head of his department's legal division . . . confirmed for him that the statement was correct." (Branson Decl. ¶ 19 (internal citations omitted)).

Third, Petitioners point out that Respondent "requested an extension of time . . . based on its allegation that it was not properly advised by its arbitration counsel, who it characterized as 'foreign solicitors,' while neglecting to disclose . . . that its arbitration counsel were qualified Malaysian litigators." (Petitioners' Memo of Law, at 16). Respondent does not contest that it failed to make this disclosure; nevertheless, this failure did not "taint" the Malaysian proceedings because Petitioners' own amicus brief filed with the Malaysian Court of Appeal informed the Court that at least two of Respondent's attorneys were qualified in Malaysia. (*Id.* at 9).

       b.  The Malaysian Court of Appeal's Decision Did Not Violate "Basic Notions of Justice"

Petitioners next critique the decision of the Malaysian Court of Appeal. However, as in *Baker Marine* and *TermoRio*, Petitioners present no adequate reason for refusing to recognize the judgment of the Malaysian Court of Appeal.

Petitioners first take issue with the Malaysian Court of Appeal's decision to excuse Respondent's failure to file its action within the 90-day limitations period.  Petitioners do not contend that the Malaysian Court of Appeal lacked the authority to excuse Respondent's delay; they contend that the Court's basis for excusing the delay—that Respondent's counsel failed to advise them of the limitations period—was unsupportable on the record because at least two of Respondent's attorneys were qualified to practice in Malaysia.  "Petitioners pointed out to the Court of Appeal in an *amicus* brief that Respondent's 'Singapore' lawyers were, in fact, qualified Malaysian practitioners," but "[t]he Court of Appeal ignored this."  (Petitioners' Memo of Law, at 9 (citation omitted)).  The Court of Appeal may have "ignored" this fact, or it may have considered it, and decided that it did not deserve particular weight because the main issue was whether Respondent's attorneys informed Respondent of the limitations period; even Malaysian lawyers may have failed to so inform Respondent.  The Court of Appeal found that counsel had not informed Respondent of the limitations period.  As described above, the affidavit submitted by Respondent provided an adequate basis for the Court of Appeal to make this determination.

Petitioners also take issue with the Court of Appeal's conclusion that Respondent acted promptly to commence the set-aside action once Respondent retained new counsel.  Petitioners argue that the Court of Appeal lacked a basis to make that determination, because "the record of the Malaysian proceeding does not contain **any** evidence of when Respondent retained counsel, when it was advised of that limitations period had passed, or when it began working on filing the proceeding."  (*Id.*).  This is not entirely true.  Respondent's affidavit to the Court of Appeal stated that Respondent learned of the deadline after seeking legal advice following Petitioners' enforcement efforts in June 2010, (Sun Decl. Ex. E ¶ 53(e)-(f)), and the Court of Appeal was more than capable of determining when the set-aside action was filed in the Malaysian High Court to

17

calculate the amount of the delay. If it were material to the Court's determination exactly when Respondent retained new counsel or discovered the limitations period, the Court could have, and likely would have, asked Respondent to provide that information. Evidently the exact dates when Respondent retained new counsel and was informed of the limitations period were not material, and the Court determined Respondent filed the action soon enough. This was a determination of Malaysian law. Because Petitioners do not allege that this determination was contrary to Malaysian law, and the Court of Appeal did have a basis to make its determination, there is no room to argue that this determination violates basic notions of justice.

> c. The Malaysian High Court's Decision Did Not Violate "Basic Notions of Justice"

Petitioners next argue that that the High Court's decision setting aside the arbitral award does not deserve deference. However, Petitioners' criticisms of the Malaysian High Court's decision at best show weaknesses in the Malaysian court's legal reasoning, and ultimately fail to demonstrate that the judgment violates basic notions of justice.

Petitioners first complain that Respondent allegedly waived its jurisdictional objection when it stated that "the Tribunal is an appropriate forum to hear disputes arising out of the Prior Contracts" in a submission to the tribunal and the High Court committed error by failing to quote this alleged waiver. (Petitioners' Memo of Law, at 12). Petitioners' argument fails because although the High Court did not explicitly quote the Respondent's alleged waiver, the High Court did conduct an extensive analysis into (1) whether Respondent properly objected to the arbitral tribunal's jurisdiction, (Malaysian High Court Judgment of March 1, 2013, at 31–40), and (2) whether Respondent waived its jurisdictional objection, (*id.* at 41–52). Ultimately, the High Court held that, as a matter of Malaysian law, the Respondent (1) had properly objected to the arbitral

tribunal's jurisdiction, (*id*. at 40), and (2) had not waived its jurisdictional objection, (*id*. at 49). Because Petitioners do not allege that the High Court's determination was contrary to Malaysian law or otherwise critique the determination, the Court finds that no violation of "basic notions of justice occurred."

Second, Petitioners take issue with the fact that the High Court failed to give preclusive effect to the rulings of this Court and the Second Circuit Court of Appeals on arbitral jurisdiction. (Petitioners' Memo of Law, at 11–12).  This argument is unpersuasive, in that it fails to account for the fact that the Malaysian High Court was evaluating *de novo* whether the arbitrators had exceeded their jurisdiction, whereas this Court and the Second Circuit's decisions applied a deferential standard of review to this same issue.  *Compare* (Decl. of Grace Xavier ¶ 11–12 ("[T]he Malaysian High Court applied a 'de novo' standard and made an independent determination of whether the arbitrators had exceeded their jurisdiction.  This is the same standard any Malaysian court would normally apply in these circumstances.")), *with Thai-Lao I*, 2011 WL 3516154, at *15 ("Respondent contends that the Panel's exceeding their jurisdiction presents an issue of arbitrability that the Court must review independently, without applying the deference ordinarily accorded to an arbitration panel's conclusions.  The Court finds that an independent review of these issues is inappropriate . . .") (citation omitted), *and Thai-Lao Lignite (Thailand) Co. Ltd. v. Gov't of Lao People's Democratic Republic*, 492 F. App'x at 152  ("[W]e find the district court did not abuse its discretion in applying a deferential standard of review in its analysis of the arbitral panel's decision.").

Last, Petitioners fault the High Court for not according any res judicata effect to the opinions upholding the award by this Court or the Second Circuit Court of Appeals.  (Petitioners' Memo of Law, at 12–13).  However, the Malaysian High Court had no obligation to grant res

judicata effect to the decisions enforcing the arbitral award by courts of secondary jurisdiction.  A

decision by a court of secondary jurisdiction confirming an arbitral award "is not truly a decision on

the merits; rather, it is an order to enforce an award resulting from litigation elsewhere, which is not

necessarily given res judicata effect in foreign jurisdictions."  *Karaha Bodas Co., L.L.C. v.*

*Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357, 372 (5th Cir. 2003).

Petitioners remaining arguments are meritless.[8]

d.  Petitioners Have Failed to Show "Extraordinary Circumstances"

The facts of this case simply do not amount to the extraordinary circumstances contemplated

by *TermoRio*.  This is not a case in which the Respondent is an entity of Malaysia's government,

which might raise a suspicion of the Malaysian courts' partiality; rather, Malaysia is a neutral, third

country that the parties mutually chose as the seat of the arbitration.  *See* Radu Lelutiu, Note,

*Managing Requests for Enforcement of Vacated Awards Under the New York Convention*, 14 Am.

Rev. Int'l Arb. 345, 351 (2003) (noting that "as in *Chromalloy* . . . the breaching party is not

infrequently a governmental entity in whose rescue national courts are eager to graciously aid").

This case is therefore distinguishable from both *PEMEX* and *Chromalloy*.  In *PEMEX*, Judge

Hellerstein found that the Mexican court's judgment violated basic notions of justice because (1)

the court retroactively applied a law not in existence at the time the parties entered into their

contract; and (2) the private party was left without a remedy to litigate the dispute that the

arbitrators had decided in its favor, because by the time the court issued its opinion, the short

limitations period in the correct forum had already ended.  2013 WL 4517225 at *14–15.  Judge

---

[8] For example, Petitioners point out that the High Court described an expert's report as "cogent and comprehensive" despite disagreeing with at least one of the expert's conclusions and that the High Court's opinion criticized the arbitral panel's legal analyses on (1) its calculation of damages; and (2) a non-party's status as a third party beneficiary. (Petitioners' Memo of Law, at 12–13).  Petitioners do not present any argument explaining why these are legal errors or make the High Court's decision "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought" or a violation of "basic notions of justice." *TermoRio*, 487 F. 3d at 938.

Hellerstein found the lack of remedy "particularly unjust" because the private party was therefore liable to the government instrumentality for damages "even though there [had] been no full hearing on the merits outside the arbitration." *Id.* at *17.

In contrast, the Malaysian High Court here set aside the arbitral award on a universally-recognized ground—that the arbitrators exceeded their jurisdiction. Furthermore the decision did not leave Petitioners here without a remedy.[9] The High Court merely ordered re-arbitration before a different panel of arbitrators. Petitioners also pursued their right to appeal the High Court's decision and received a decision from the Malaysian Court of Appeal affirming the High Court's decision.

    e.  Conclusion

Because the Court finds that the process before the Malaysian courts and the judgments of those courts did not violate basic notions of justice, the Court GRANTS Respondent's motion to vacate.

    3.  Security

Petitioners also urge the Court to order Respondent to post security as a condition of moving under Rule 60 or, "should the Court be inclined to grant the Motion to Vacate, it should require Respondent to post security as a condition for the entry of any order vacating the judgment, to ensure that the Judgment will be satisfied if (a) the Court's order vacating the judgment is reversed on appeal, and/or (b) the Malaysian High Court's judgment annulling the award is reversed or vacated on appeal." (Petitioners' Memo of Law, at 34). Respondent claims that requiring security as a condition of vacating the judgment would violate the Foreign Sovereign Immunities Act

---

[9] In mid-2010, Petitioners also sought to enforce the arbitral award in France. The Court notes that the Paris Court of Appeal independently refused to enforce the arbitral award on the ground that the arbitrators exceeded their jurisdiction "by deciding on the compensation of losses resulting from [contracts] which are separate from the PDA." (Branson Decl., Ex. T, at 6).

("FSIA") and is contrary to the New York Convention.  The Court finds Respondent's arguments

convincing and therefore DENIES Petitioners' request.

> a.   Requiring Respondent to Post Security Would Violate the FSIA

Section 1609 of the FSIA provides that:

> Subject to existing international agreements to which the United
> States is a party at the time of enactment of this Act the property in
> the United States of a foreign state shall be immune from attachment
> arrest and execution except as provided in sections 1610 and 1611 of
> this chapter.[10]

28 U.S.C. § 1609.  Under section 1610(d), a foreign sovereign's property is not immune from

attachment if it "has explicitly waived its immunity from attachment prior to judgment."  Where a

foreign sovereign has waived its sovereign immunity, its property may be attached only if the

property is "used for a commercial activity in the United States."   28 U.S.C. § 1610(a).

In *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, the Second Circuit found that

an instrumentality of a foreign state could be required to post pre-hearing security because it had

expressly waived its immunity and therefore met the exception in section 1610(d) of the FSIA. 344

F.3d 255, 260 (2d Cir. 2003).  Here, as in *Banco*, Respondent has affirmatively waived its sovereign

immunity.  *Thai-Lao I*, 2011 WL 3516154, at *7.  However, "sovereign property must satisfy the

statutory criteria laid out in Section 1610(a) 'even if the foreign sovereign has waived its

immunity.'"  *Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*,

10 Civ. 5256, 2013 WL 1703873, at *6 (S.D.N.Y. Apr. 19, 2013) (Wood, J.) (quoting *Aurelius*

---

[10] In *Stephens v. Nat'l Distillers and Chem. Corp.*, 69 F.3d 1226 (2d Cir. 1995) the Second Circuit "held that the posting
of security required under New York Insurance Law § 1213(c) constituted the functional equivalent of a prejudgment
attachment from which foreign sovereigns were immune." *Banco*, 344 F.3d at 260.  Despite *Stephens*, Petitioners argue
that the Court may require Respondent to pay security in this case because "sovereign immunity concerns in connection
with attachments do not apply where the sovereign is seeking equitable relief under Rule 60." (Petitioners' Memo of
Law, at 33).  Petitioners rely on *Sales v. Republic of Uganda*, 828 F. Supp. 1032, 1037 (S.D.N.Y. 1993), in which the
Court conditioned Uganda's ability to vacate the default judgment entered against it and assert sovereign immunity
upon its securing the plaintiff's claim.  *Id*.  *Sales* is of limited relevance to this case, because the decision (1) was pre-
*Stephens* and no court has followed its ruling; and (2) was not subject to the New York Convention.

*Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009)).  "Thus, the property that is subject to attachment and execution must be 'property in the United States of a foreign state' *and* must have been 'used for a commercial activity' at the time the writ of attachment or execution is issued."  *Aurelius*, 584 F.3d at 130.

Petitioners have conducted discovery into whether Respondent has attachable property in the U.S., (Branson Decl. ¶¶ 65–66; ¶¶ 67–71; ¶¶ 72–79 (describing discovery into Respondent's overflight fees, diplomatic accounts, hydropower project payments, and Central Bank records)), but have not yet identified any property that meets the requirements of § 1610(a).  *See Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 10 Civ. 5256, 2013 WL 1703873 (S.D.N.Y. Apr. 19, 2013) (Wood, J.) (finding Respondent's overflight fees immune from attachment under the FSIA); (Respondent's Reply Memo of Law, at 13 ("[T]here is no evidence the Lao Government has ***any*** attachable assets in the United States.")).  Because Petitioners have not identified any property that meets the requirements of § 1610(a), requiring Respondent to post security as a condition of moving under Rule 60(b) or for the entry of an order vacating the arbitral award would violate the FSIA.

> b.   Requiring Respondent to Post Security is Contrary to the New York Convention

Petitioners' argument that the New York Convention prevails over the FSIA is unavailing. Section 1609 of the FSIA states that the FSIA is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act."  "The United States acceded to the New York Convention on September 30, 1970, and enacted the FSIA on October 21, 1976. Therefore, the New York Convention was an 'existing international agreement' that was enacted before the adoption of the FSIA, and was . . . incorporated by the FSIA."  *Skandia Am. Reinsurance Corp. v. Caja Nacional de Ahorro y Segoro*, 96 Civ. 2301, 1997 WL 278054, at *4 (S.D.N.Y. May

23, 1997) (Wood, J.).  The decisions Petitioners cite merely stand for the proposition that because the FSIA incorporates the New York Convention, a court may order a foreign sovereign to pay security under *Article VI* of the New York Convention, which explicitly grants a court discretion to require security pending the outcome of a set-aside action.[11]  *See, e.g.*, *Skandia*, 1997 WL 278054, at *5 ("I find that Article VI of the New York Convention allows me to require sovereigns to post pre-judgment security *if they move to set aside or suspend an arbitration award*, which would allow me to order the posting of pre-judgment security pursuant to N.Y. Ins. Law § 1213(c)." (emphasis added)); *see also Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 400 (7th Cir. 2002) (affirming district court's decision ordering a foreign instrumentality to post security despite the FSIA, because the foreign instrumentality had made an application to set aside the arbitral award and the "language of [the New York Convention] allowing a court to impose a security requirement is very explicit").  In this case, Respondent has already obtained a judgment setting aside the arbitral award by a court of competent jurisdiction and now invokes Article V(1)(e) of the New York Convention.  Article VI is therefore inapplicable to this case.  Article V does not explicitly grant a court discretion to require security and the Court will not read such authority into Article V.[12]

   c.  Conclusion

---

[11] Specifically, Article VI of the New York Convention provides that:

> If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

21 U.S.T. at 2520.

[12] Because Article VI grants the court discretion in deciding whether or not to order security (and it is the only explicit provision of the New York Convention discussing security), if the FSIA were not a bar to such a requirement in this case, the Court here too would have discretion in determining whether or not to order security.  *See* 21 U.S.T. at 2520 ("[T]he authority upon which the award is sought to be relied upon . . . *may* . . . order the other party to give suitable security." (emphasis added)).  The Court here would decline to exercise that discretion.

The Court therefore DENIES Petitioners' request to require Respondent to post security as a condition of moving under Rule 60(b) or for the entry of an order vacating the arbitral award.

III.     Conclusion

For the foregoing reasons, Respondent's motion to vacate this Court's August 5, 2011, judgment is GRANTED.  Petitioners' request that the Court order Respondent to post security is DENIED.[13]


SO ORDERED.

Dated: New York, New York
       February 6, 2014


/s/_____
Kimba M. Wood
United States District Judge

---

[13] Petitioners have filed another case before this Court, in which they seek recognition of an English judgment enforcing the arbitral award.  *See* 13 Civ. 1332.  The English judgment was entered prior to the Malaysian judgment setting aside the arbitral award and relies on this Court's August 3, 2011, Opinion and Order enforcing the arbitral award.  *See* (High Court of Justice, Queens Bench Division, Commercial Court, Judgment of October 26, 2012 ¶ 27 ("I am not deciding now, finally that [the award] is valid.  As I have said, there are pending proceedings in the Malaysian court, which is the supervisory court where the arbitration took place and, ultimately, whether or not the award is valid or not is a matter for that court, not for this court.") [Dkt. No. 271-1]); *see also* (*id.* at ¶ 28 ("[T]his award is manifestly valid and given what was decided by the US courts any possible objections that might be raised with regard to the enforceability of this award have been determined in the United States . . . and are matters of issue estoppel.")).  In light of this Court's present Opinion and Order vacating its August 5, 2011, judgment enforcing the arbitral award, the Court believes that the 13 Civ. 1332 claims are now moot and that that action should be dismissed and closed.  If Petitioners object, they may file a memorandum addressing the issue on or before March 6, 2014.